## COMMONWEALTH vs. CLARE WERNER.

No. 11-P-368.

Plymouth. February 1, 2012. - May 2, 2012.

Present: GRASSO, KAFKER, & MILKEY, JJ.

*Practice, Criminal,* New trial, Deliberation of jury, Instructions to jury, Voluntariness of statement, Jury and jurors. *Jury and Jurors. Evidence,* Relating to deliberation by jurors, Voluntariness of statement. *Internet.*

A trial court judge did not abuse her discretion in denying, after an evidentiary hearing, a criminal defendant's motion for a new trial, in which the defendant had alleged that certain Internet activity by members of the jury on social media Web sites raised the possibility that the jurors had been exposed to extraneous influences, where the judge, after hearing from the affected jurors, assessing their credibility, and reviewing their postings, could properly conclude that neither juror had been subjected to an extraneous influence and that no further inquiry was required; and where, at any rate, there was overwhelming evidence of the defendant's guilt. [693-699]

Discussion of the additional jury instructions that may be necessary, at criminal trials, to address the growing problem of jurors' inappropriate use of social media. [699-701]

There was no merit to a criminal defendant's contention that a jury instruction explaining why Miranda warnings were not given to the defendant impermissibly intruded into the jury's voluntariness inquiry pursuant to the humane practice rule. [701-704]

INDICTMENTS found and returned in the Superior Court Department on December 22, 2006.

The cases were tried before *Wendie I Gershengorn*, J., and a motion for a new trial was heard by her.

*Peter M. Onek*, Committee for Public Counsel Services, for the defendant.

*Jessica V. Barnett*, Assistant Attorney General, for the Commonwealth.

KAFKER, J. After the defendant, Clare Werner, was convicted at a jury trial of twelve counts of larceny in excess of $250, in

violation of G. L. c. 266, § 30(1), her defense counsel visited Facebook, a social networking Web site, and reviewed public postings by two jurors made during and after the trial concerning their jury service, as well as the responses to those postings. The primary argument in this consolidated appeal from the defendant's convictions and from the denial of her new trial motion is that the Facebook postings and responses raised the possibility that the jurors may have been exposed to extraneous influences. In particular, the defendant argues that the judge should have waited for Facebook to provide information pursuant to a subpoena before denying her motion for a new trial. We conclude that the judge did not abuse her discretion in denying the motion for a new trial after an evidentiary hearing. We also conclude that the other issue raised on appeal — whether a jury instruction explaining why Miranda warnings were not given intruded into the jury's voluntariness inquiry pursuant to the humane practice rule — is without merit. We therefore affirm.

*Background.* The jury were warranted in finding the following facts. During fiscal year 2005, the defendant was a bookkeeper in the student accounts office of Bridgewater State College (College),[1] which handled payments for students' tuition and fees. When tellers received payments in cash or by check, they logged them into a computerized accounting system and placed them in sealed bank deposit bags with deposit slips. The defendant was responsible for processing the deposit bags.

On numerous occasions between July, 2004, and June, 2005, the defendant opened deposit bags, took the cash that was to be deposited, and replaced it with an equivalent amount in checks from incoming student payments that she had previously held back. If the replacement checks did not exactly total the amount of cash she removed, the defendant would include a personal check from her own account in the amount of the difference, typically a relatively small sum. She would then alter or rewrite the deposit slips to match the changed contents of the bags. The total amount of the thefts was approximately $355,000. When questioned by investigators, the defendant admitted to stealing

---

[1]After the events at issue in this case, the school was renamed Bridgewater State University. See St. 2010, c. 189.

money from the accounts two or three times per week, in totals of between \$600 and \$700, and once taking \$8,000.[2]

*Posttrial proceedings.* The evening after the guilty verdicts were returned, defense counsel, having previously read general media reports about improper use of social media by jurors, attempted to look up the jurors on Facebook. Two of them, Juror A and Juror B, had open profiles, meaning that their profiles were accessible to any Facebook member. Defense counsel discovered that on March 30, 2009, while jury selection was ongoing, Juror A had posted: "[I] had jury duty today and was selected for the jury . . . . Bleh! Stupid jury duty!" Juror A had received three responses, one of which stated: "Throw the book at 'em." As the trial progressed, Juror A posted about sitting for long hours and her desire to complete the trial. At one point another juror in the trial, Juror C, who had been "friended" by Juror A during the trial, responded to her, saying, "[H]opefully it will end on [M]onday . . . ."[3]

Also during jury empanelment on March 30, Juror B posted at 8:05 A.M.: "Waiting to be selected for jury duty. I don't feel impartial." A person responded, "Tell them 'BOY HOWDIE, I KNOW THEM GUILTY ONES!" Later that day at 4:54 P.M., Juror B posted again: "Superior Court in Brockton picks me . . . for the trail [*sic*]. The[y] tell us the case could go at least 1 week. OUCH OUCH OUCH." Juror B's wife replied to this at 9:37 P.M., "Nothing like sticking it to the jury confidentiality clause on Facebook. . . . Anyway, just send her to Framingham quickly so you can be home for dinner on time." Later that evening, another of his friends responded: "I'm with [Juror B's wife] . . . tell them that you asked all your F[ace] B[ook] friends and they think GUILTY."[4]

After finding these postings, defense counsel filed a motion

---

[2]We reserve the details of the investigators' questioning for our discussion of the voluntariness issue.

[3]Juror C had a "closed" Facebook profile, which meant that her Facebook page was not open to public view.

[4]After the jury returned its verdicts, Juror B posted a lengthy note, similar to a Web log or "blog" entry, entitled "Life in the Jury Box." The posting described how he had previously been excused from jury duty when he "told the story of how [he] was held at gun point behind a TJ Maxx by some young robbers in Lawrence MA" and how this time he had "decided to not build any

for a new trial and sought to subpoena records from Facebook concerning postings and messages to and from these two jurors regarding their jury service. The trial judge, who also heard the motion for a new trial, decided to hold an evidentiary hearing at which Juror A and Juror B would testify. The judge also issued a subpoena to Facebook.[5] Prior to the hearing, however, Facebook had not responded to the subpoena or telephone calls from the court. The evidentiary hearing was held on June 29, 2009.

At that hearing, Juror A was asked whether "during the very beginning of the case, that is impanelment, through the receiving of the jury verdict, you may have gone online and posted some information regarding this case." She responded, "I don't believe I did." She was then shown the posting that described her feelings about being selected and she recalled the posting and the responses. She explained that the postings were from people "sympathizing with . . . having to spend time sitting on a jury." She acknowledged "friending" Juror C and another juror but said she had not sent any electronic mail messages (e-mails) or instant messages to them during the trial.

Juror B testified that he was the author of the postings. He also testified that he did not recall seeing the "BOY HOWDIE" response to his 8:05 A.M. posting or any other responses to that posting. When asked about his wife's response to the 4:54 P.M. post, he denied that he had told his wife "the details of the case, the name of the defendant, anything that was presented as evidence." He suggested that she may have learned about the

elaborate excuses or even try to get out of" jury service. The posting also said that he had been "a law breaker." Prospective jurors in the case at issue had completed a "Confidential Juror Questionnaire," which asked, inter alia, whether the juror or anyone in the juror's household or family had been "arrested, been sued . . . been charged with a crime . . . been a witness in a civil or criminal case . . . [or] been a crime victim . . . ." He had answered negatively. The blog note also stated that the evidence of guilt was overwhelming "[d]espite our efforts to try to find at least ONE charge we could say Not Guilty on." The defendant has not argued on appeal that Juror B's statements or omissions on the questionnaire, or his postings during or after the trial, demonstrated bias. This claim was raised and rejected below.

[5]Defense counsel had discovered that Juror A had "friended" Jurors B, C, and D. His motion also requested that the Facebook records of Jurors C and D be provided, and that they be questioned at the evidentiary hearing. The defendant does not appeal from the judge's denial of the motion as to the records of Jurors C and D, and her decision not to call them for questioning.

case through "public records." He also testified that he did not reply to any of the responses to his 4:54 P.M. posting, although he did see the first three responses. Nor could he specifically recollect going back to Facebook between the 4:54 P.M. posting and the end of the trial. He testified that "after the trial when I became aware of the controversy, I deleted my wall."[6]

The trial judge found that none of the responses to any of the postings contained extraneous matters. She further found that "no evidence adduced at the hearing supports the defendant's claim that either Juror A or Juror B was exposed via the Internet to any extraneous matter." In denying the motion for a new trial, the judge rejected the request by the defendant to leave the hearing open until Facebook responded to the subpoena. The judge found: "The credible testimony given at the evidentiary hearing leads the Court to conclude that the records subpoenaed are unnecessary in these circumstances. Put differently, were the Court to have had the benefit of that testimony ex ante, the Court would not have . . . exercised its discretion under Mass. R.Crim.P. 30(c)(4) to grant postconviction discovery."[7]

*Discussion.* 1. *Exposure to extraneous influences.* a. *Motion for new trial.* A trial judge "may grant a new trial at any time if it appears that justice may not have been done." Mass.R.Crim.P. 30(b), as appearing in 435 Mass. 1501 (2001). A judge may also order appropriate discovery after the verdict if the defendant makes "a sufficient showing that the discovery is reasonably likely to uncover evidence that might warrant granting a new trial." *Commonwealth* v. *Daniels*, 445 Mass. 392, 407 (2005). See Mass.R.Crim.P. 30(c)(4).

More specifically, when a defendant claims she was prejudiced by a juror's communications with outside parties during trial,

---

[6]His Facebook "wall" contained his public postings.

[7]The judge also noted that, given the overwhelming evidence of guilt, the Commonwealth would likely have been able to meet its burden of showing that any extraneous influence did not prejudice the defendant. See *Commonwealth* v. *Kincaid*, 444 Mass. 381, 386 (2005) (if defendant establishes existence of extraneous influence, Commonwealth must prove that defendant was not prejudiced beyond reasonable doubt). The judge based this conclusion on her observations of the evidence at trial and the short time (less than five hours) the jury deliberated before finding the defendant guilty of all twelve charges. See *Commonwealth* v. *Hunt*, 392 Mass. 28, 42-43 (1984).

she "bears the burden of demonstrating that the jury were in fact exposed to . . . extraneous matter." *Commonwealth* v. *Fidler*, 377 Mass. 192, 201 (1979). See Mass. G. Evid. § 606(b) & note, at 162-164 (2011). She must satisfy this burden of proof by a preponderance of the evidence. *Commonwealth* v. *Kincaid*, 444 Mass. 381, 386-387 (2005). Defense counsel is also in a sensitive position in satisfying this requirement, as counsel is not permitted to independently contact jurors. *Commonwealth* v. *Fidler, supra* at 202. If the defendant does establish the existence of extraneous influences, the Commonwealth must demonstrate beyond a reasonable doubt that the extraneous matter did not cause her prejudice. *Id.* at 201.

In the instant matter, the defendant does not contend that, on the record before the judge when she decided the new trial motion, there was sufficient evidence to establish that the jury learned of relevant "information not part of the evidence at trial." *Commonwealth* v. *Guisti*, 434 Mass. 245, 251 (2001) (*Guisti I*). See *Commonwealth* v. *Guisti*, 449 Mass. 1018 (2007) (*Guisti II*). The defendant acknowledges that the postings, responses, and testimony of the jurors reveal no extraneous information. The defendant instead argues that she was deprived of the opportunity to develop evidence of an extraneous influence when the judge ruled on the new trial motion prior to receiving the materials subpoenaed from Facebook.[8] The defendant suggests that the case law compels the judge to undertake further investigation because the jurors' Facebook postings cast doubt on the truthfulness of their testimony at the evidentiary hearing.

The most instructive cases regarding the defendant's argument that the new trial motion could not be decided without further inquiry are *Guisti I* and *Guisti II*. There, defense counsel learned after the jury verdicts that one of the jurors had sent two e-mails during the trial to an e-mail list with approximately 900 subscribers. *Guisti I*, 434 Mass. at 249-250 & n.4. The first e-mail stated that the juror was "stuck in a 7 day-long Jury Duty rape/assault case . . . missing important time in the

---

[8]The record gives no indication that Facebook has ever made any response to the subpoena, or that either the defendant or her counsel has attempted to contact Facebook to encourage compliance.

gym . . . . Just say he's guilty and lets [*sic*] get on with our lives!" *Id.* at 249-250. The second e-mail read: "Please understand I was joking . . . and do not take my quote 'Just call him guilty so I can get back in the gym' (or something like that) seriously . . . I should really watch it next time, I got a 2 page letter from 'Ann' because she took me toooooo seriously." *Id.* at 250.

Guisti's defense counsel filed a motion for a postverdict voir dire, which the judge denied without an evidentiary hearing or other inquiry of the juror. *Ibid.* The court in *Guisti I* held that the trial judge was required to conduct further inquiry because, "due to the large number of persons who would have received the juror's messages and could have responded, the juror left herself vulnerable to receiving information about the case at issue prior to the rendering of the verdict." *Id.* at 253. Concluding that, "[w]here a case is close, as here, a judge should exercise discretion in favor of conducting a judicial inquiry," *ibid.*, quoting from *Commonwealth* v. *Dixon*, 395 Mass. 149, 153 (1985), the *Guisti I* court remanded the case for a limited voir dire directed at the juror, the responses to the postings, and whether she had communicated with other jurors about the responses. *Ibid.*

On remand, the trial judge conducted a voir dire of the juror and determined that there was no evidence to indicate that the juror had been exposed to extraneous information. *Guisti II*, 449 Mass. at 1018. She then again denied the motion for a new trial. In an unpublished order, the Supreme Judicial Court remanded again out of concern that "the judge might have interpreted our initial remand order more narrowly than we intended." *Ibid.* The court ordered that the trial judge "determine the appropriateness" of ordering a forensic examination of the juror's computer and "consider . . . whether the contents of any responsive e-mails can be determined through the records of an [I]nternet mail service provider." The remand order reiterated the extent of the judge's discretion to set the scope of the inquiry, stating, "In sum, the judge is free to consider evidence, to the extent necessary and appropriate, from sources other than her questioning of the juror . . . ." *Id.* at 1018-1019.

Pursuant to the second remand order, the trial judge in *Guisti*

then took additional evidence, including a forensic examination of a computer, and eventually concluded that the juror had not been exposed to extraneous influences. *Id.* at 1019 & n.1. In so doing, the judge credited the juror's testimony that she had received no responses other than those of two attorneys warning her to heed her obligations as a juror. *Ibid.* The Supreme Judicial Court affirmed the judgments, concluding that, in the absence of a showing that the jury were exposed to extraneous matters, "the judge was not obligated to go further." *Id.* at 1019, citing *Commonwealth* v. *Dixon*, 395 Mass. at 151.

We do not read *Guisti I* or *Guisti II* to require that the trial judge go beyond the questioning of jurors in the instant case. Rather, it is our understanding that *Guisti I* and *Guisti II* reinforce the precept that the judge's discretion is "broad," not circumscribed. *Guisti I, supra* at 251. Where there is a colorable showing of extraneous influence, the judge is neither compelled to go beyond juror questioning nor curtailed from doing so. The court in *Guisti II* was concerned that its original remand order left the extent of that discretion unclear. The scope of the judge's postverdict inquiry is determined by the postings and responses themselves, the medium in which the postings appeared, the evidence of extraneous influence uncovered, if any, and the credibility of the testifying juror, as determined by the evaluating judge. The judge retains the discretion to determine what additional evidence "from sources other than her questioning of the juror" is "necessary and appropriate . . . to determine fully the facts" relevant to resolving the extraneous influence inquiry. *Guisti II, supra* at 1019.

The judge in the instant matter had the guidance of both *Guisti* decisions and clearly understood the scope of permissible inquiry. Finding that the defendant had made a "colorable showing" of extraneous influence, the judge, citing *Guisti I*, appropriately allowed the defendant's motion for an evidentiary hearing. See *Guisti I, supra* at 251, citing *Commonwealth* v. *Dixon, supra* at 151-152 ("A trial judge . . . is under no duty to conduct [a postverdict] inquiry *unless* the defendant makes a 'colorable showing' that extraneous matters may have affected a juror's impartiality" [emphasis supplied]). As with the juror's posting to 900 subscribers in *Guisti*, see *Guisti I* at 250, here,

the potential number of Facebook users who could have seen Juror A's and Juror B's postings and responded to them was extensive[9] and raised sufficient concerns to warrant further inquiry.[10] The judge's initial response was simultaneously to (1) order a hearing to allow court-supervised questioning of Juror A and Juror B, and (2) issue a subpoena to Facebook for its records. As explained below, after hearing from the affected jurors and assessing their credibility, the judge properly concluded that neither juror had been subjected to an extraneous influence in response to his or her postings and that no further inquiry was required. We discern no error in the judge's ruling and no abuse of discretion in her conclusion that further discovery of Facebook records was not required.

The judge did not err in concluding that the postings contained no evidence of extraneous influence. Instead, the postings involved the type of "attitudinal expositions" on jury service, protracted trials, and guilt or innocence that fall far short of the prohibition against extraneous influence. See *Commonwealth* v. *Fidler*, 377 Mass. at 199. See also *Guisti I*, *supra* at 252 (" 'Just say he's guilty and lets [*sic*] get on with our lives' does not involve an extraneous matter"); *Commonwealth* v. *Scanlan*, 9 Mass. App. Ct. 173, 183 (1980) (fellow juror's statement, "Why doesn't [the defendant] just get up and plead guilty and save us all the time and money?" did not warrant further inquiry). The postings do not in any way reveal "specific facts not mentioned at trial concerning one of the parties or the matter in litigation." *Commonwealth* v. *Fidler*, 377 Mass. at 200. Moreover, the postings made during the trial contained no case-specific information whatsoever. See *United States* v. *Fumo*, 655 F.3d 288, 306 (3d Cir. 2011) (postings were "so vague as to be virtually meaningless[; juror] raised no specific facts dealing with the

[9]As "open postings," they were limited only by the number of Facebook members. Facebook reports that, as of December, 2011, it had 845 million monthly active users and an average of 483 million daily active users. See http://newsroom.fb.com/content/default.aspx?NewsAreaID=22 (last visited April 30, 2012).

[10]The record does not disclose how many Facebook users could have responded to Juror A's and Juror B's postings privately. The judge stated in her ruling allowing the subpoena that "a large number [of] Facebook members could have" done so.

trial"). Anyone viewing the jurors' postings on Facebook would have had no idea of the name of the defendant, what crime she was accused of committing, or what the trial was about. Thus, it is not surprising that the responses were equally nonspecific.

Nor can it reasonably be said that the judge erred in her assessment of the credibility of the witnesses' testimony, a matter particularly within her province. She found that "no evidence adduced at the hearing supports the defendant's claim that either [Juror A] or [Juror B] was exposed via the Internet to any extraneous matter." Implicit in that finding was her crediting both witnesses' testimony to that effect. In regard to Juror B, where questions were raised regarding his truthfulness, the judge carefully wrestled with both his statements and his omissions. Where the judge considered Juror B's testimony less than fully forthcoming, she so stated. For example, she recognized in her findings that Juror B had "informed his wife on the first day of trial that he was a juror in a criminal case and that the defendant was female." She did not discredit the remainder of his testimony. In fact, in her discussion of whether Juror B was a biased juror, an issue that has not been pursued on appeal (see note 4, *supra*), the judge expressly found that she "credit[ed] [Juror B]'s evidentiary hearing testimony." We are in no position to substitute our judgment for that of the judge on credibility questions. See *Commonwealth* v. *Kincaid*, 444 Mass. at 388.

Finally, as the judge noted, there was overwhelming evidence of guilt here, including admissions by the defendant that she had stolen money on numerous occasions. See *Guisti II*, 449 Mass. at 1019 n.3, quoting from *Commonwealth* v. *Pillai*, 445 Mass. 175, 185 (2005) (appellate court gives "special deference to the factual findings" of motion judge who was also trial judge). Even if an extraneous influence had been discovered, the Commonwealth likely would have been able to prove the defendant was not prejudiced. See *Commonwealth* v. *Kincaid*, 444 Mass. at 386.

In sum, (1) review of the Facebook postings and juror testimony revealed no evidence of extraneous influences on the jury; (2) there was overwhelming evidence of guilt; (3) the posts that were made during the trial were general complaints

about jury service and silly nonspecific responses to those complaints; (4) although the posts examined by the judge appeared on open profiles on Facebook, and were thus accessible by any of the millions of Facebook members, there was no identifying information in any of the posts about the particular defendant or crime; and (5) the judge credited the jurors' testimony that they had not been exposed to any extraneous information in any other postings or responses. The defendant, therefore, could offer only unsupported speculation that the desired subpoenaed documents might include previously undisclosed communications of extraneous information to the jurors. It was therefore within the judge's broad discretion to deny the motion for new trial without awaiting Facebook's response to the subpoena. See *Guisti II, supra* at 1019-1020 ("[T]he trial judge's conclusion that the jury were not exposed to extraneous influences was amply supported by the evidence and her findings. Neither a new trial nor further proceedings are warranted").

b. *Additional instruction.* We take this opportunity to comment upon what additional steps may be necessary to address jurors' inappropriate use of social media such as Facebook and Twitter, a growing problem faced by courts around the country. See, e.g., *United States* v. *Fumo,* 655 F.3d at 298, 304-306; *id.* at 331-333 (Nygaard, J., concurring in part and dissenting in part); *State* v. *Goupil,* 154 N.H. 208, 214-222 (2006).

In the instant case, the trial judge had been quite explicit in her instructions. On the first day of trial, she instructed the jurors "not to chat about the case. Don't discuss it with anyone. Don't chat among yourselves . . . . Each morning I'm to ask you if you have spoken about the case to anyone . . . have you read anything or heard anything about the case. . . . Because if you do read anything, if you do some investigation of your own, if you Google this, . . . it results in a mistrial." Before releasing the jurors on the first day, she reiterated these points and inquired at the beginning of each trial day whether the jurors had talked about the case with anyone.

Apparently, even these instructions were not enough to keep jurors from at least alluding to their jury service on social media Web sites. More explicit instructions about the use of social

media and the Internet may therefore be required.[11] Instructions not to talk or chat about the case should expressly extend to electronic communications and social media, and discussions about the use of the Internet should expressly go beyond prohibitions on research. Jurors should not research, describe, or discuss the case on- or off-line.[12] Jurors must separate and insulate their

—————————

[11]We note, for example, the model jury instructions regarding "The Use of Electronic Technology to Conduct Research on or Communicate about a Case" prepared by the Judicial Conference Committee on Court Administration and Case Management, quoted in *United States* v. *Fumo*, 655 F.3d at 304-305:

"[Instructions] Before Trial:

". . .

"Until you retire to deliberate, you may not discuss this case with anyone, even your fellow jurors. After you retire to deliberate, you may begin discussing the case with your fellow jurors, but you cannot discuss the case with anyone else until you have returned a verdict and the case is at an end. . . . I know that many of you use cell phones, Blackberries, the [I]nternet and other tools of technology. You also must not talk to anyone about this case or use these tools to communicate electronically with anyone about the case. This includes your family and friends.

"You may not communicate with anyone about the case on your cell phone, through e-mail, Blackberry, iPhone, text messaging, or on Twitter, through any blog or website, through any [I]nternet chat room, or by way of any other social networking websites, including Facebook, My Space, LinkedIn, and YouTube.

"[Instructions] At the Close of the Case:

"During your deliberations, you must not communicate with or provide any information to anyone by any means about this case. You may not use any electronic device or media, such as a telephone, cell phone, smart phone, iPhone, Blackberry or computer; the [I]nternet, any [I]nternet service, or any text or instant messaging service; or any [I]nternet chat room, blog, or website such as Facebook, My Space, LinkedIn, YouTube or Twitter, to communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict."

See Dunn, Federal Judicial Center, Jurors' Use of Social Media During Trials and Deliberations: A Report to the Judicial Conference Committee on Court Administration and Case Management, at 6-10 (2011), at http://www.fjc.gov/public/pdf.nsf/lookup/dunnjuror.pdf/–ile/dunnjuror.pdf (last viewed April 30, 2012).

[12]We recognize that personal or work commitments may require exceptions for statements to the effect that a juror has been selected for jury service, or is unavailable due to jury service.

jury service from their digital lives.[13] The Jury Commissioner also may wish to consider including in the Trial Juror's Handbook, which is distributed to all prospective jurors, an explicit warning about the use of social media during service as a juror. See The Trial Juror's Handbook, Office of Jury Commissioner for the Commonwealth (6th ed. 1998).

2. *Contested jury instruction relating to voluntariness of statements.* In her direct appeal, the defendant raises one issue concerning the conduct of the trial, arguing that the judge erred in giving a jury instruction regarding Miranda warnings and the voluntariness of the defendant's statements to investigators. As the jury were warranted in finding, on August 30, 2005, a State trooper and a financial investigator working for the Attorney General's office (investigators) drove to the defendant's home. The defendant came out to meet them but declined to speak with them in her house because family members were present. Instead, they agreed to meet at a local coffee shop an hour later. There, the investigators told her that she was the main suspect in an investigation into larceny at the College. The three spoke for about an hour. The defendant initially acknowledged that she had opened deposit bags, but she stated that she did so only to fix accounting errors. After the investigators expressed skepticism and stated that some of her personal checks were found in the deposit bags, the defendant became nervous. The investigators told her that they had been respectful of her and asked that she show them courtesy by answering their questions honestly.

At this point, the defendant asked what would happen if she admitted to stealing money. The investigators stated that she would not be arrested that day, but would have to answer to charges in court. The defendant then described her system of substituting checks and admitted doing so two or three times

---

[13]As jurors now frequently have access to social media on portable phones and similar devices, making it possible for them to post and receive information from the courthouse during trial and deliberations, this becomes even more of a challenge. See *Commonwealth* v. *Rodriguez,* 63 Mass. App. Ct. 660, 676 n.9 (2005) (noting that, "[a]s these wireless devices become increasingly common and sophisticated — with Internet access and video and recording capabilities — and their use taken for granted as an ordinary and even habitual or reflexive part of daily life, careful instruction and monitoring by trial judges is required").

per week, regularly taking between $600 and $700, but once as much as $8,000. At the end of the interview, the defendant thanked the investigators for being nice to her. On cross-examination, the State trooper who interviewed the defendant at the coffee shop testified that he had not given Miranda warnings to the defendant at that time. The Commonwealth objected, arguing that the defendant was attempting to raise an unfair inference from the absence of warnings, whereas a pretrial motion to suppress had been denied because the defendant was not in custody when she made the inculpatory statements.[14] At a bench conference, the trial judge stated that voluntariness was an issue for the jury and that she would instruct that Miranda warnings were not required in this case. Thereafter, she instructed the jury:

> "Miranda [w]arnings[] are only required if a person is in custody. However, and I will tell you in my instructions, you may generally consider whether the statement that is alleged to have been given to the officer by the defendant was a voluntary statement or whether it was coerced. . . . But [the Miranda warnings were] not required to be given to [the defendant] because she was not in custody."

Defense counsel did not object. In the final charge, pursuant to the humane practice of this Commonwealth, the trial judge instructed the jurors to consider the defendant's statements at the coffee shop only if they found beyond a reasonable doubt that the defendant had made them voluntarily.[15] See *Commonwealth* v. *Tavares*, 385 Mass. 140, 152, cert. denied, 457

---

[14]The defendant does not challenge the denial of the motion to suppress.

[15]In her final charge to the jury, the judge instructed as follows:

"You have heard in this case that the defendant may have made some incriminating statements to the police.

"Now, the Commonwealth must prove beyond a reasonable doubt that any statement made to the police was voluntary and they have to prove that beyond a reasonable doubt. That is, that [the defendant] was not coerced or tricked.

" . . .

"Custodial interrogation consists of questioning by law enforcement officers after a person has either been taken into custody or deprived of

U.S. 1137 (1982). There was no objection. The defendant claims that the instruction regarding Miranda warnings, given during the trooper's testimony, created a substantial risk of a miscarriage of justice.

We begin with the observation that there was no evidence at trial suggesting that the investigators coerced the defendant into making the statements at the coffee shop, other than the fact that she became nervous. See *Commonwealth* v. *Sneed*, 440 Mass. 216, 222 (2003) (being "stressed by the interrogation" is not sufficient to raise reasonable doubt as to voluntariness). Nor is there any other evidence of coercion. Indeed, as the defendant herself noted, the investigators were courteous and accommodated her desire to be questioned outside her home. The defendant therefore received more than she was entitled to when the judge gave the humane practice instruction. See *Commonwealth* v. *Anderson*, 425 Mass. 685, 691-692 (1997).

Moreover, we discern no merit to the argument that the judge's instruction concerning Miranda warnings prejudiced the jury by removing relevant evidence of voluntariness from the jury's consideration. The defendant relies on the Supreme Judicial Court's observation that "evidence bearing on whether [Miranda] warnings were given" is relevant to the voluntariness of confessions. See *Commonwealth* v. *Chung*, 378 Mass. 451, 458 n.9 (1979). However, in reference to that observation in *Chung*, the court later noted that "such observations were made in cases involving custodial interrogation where Miranda warnings are required" and stated further that, "[w]here statements are made during conversation where Miranda warnings are not required, it is within the judge's discretion to exclude testimony concerning the giving or failure to give Miranda warnings as long as the judge preserves the basic issue of voluntariness for the jury." *Commonwealth* v. *Nadworny*, 396 Mass. 342, 369-370 (1985), cert. denied, 477 U.S. 904 (1986). Thus, it was within the judge's discretion to give the instructions she gave here. They both preserved the issue of voluntariness and removed an unfair inference that the investigators had acted improperly

her freedom in any significant way. And it is entirely up to you to decide from the evidence whether that has happened in this case."

by failing to give Miranda warnings, where no such warnings were required.[16]

*Conclusion.* The denial of the motion for a new trial without awaiting Facebook's response to the subpoena was within the judge's discretion, as there was only speculation regarding extraneous influences on the jury arising out of juror postings. As for the conduct of the trial itself, there is no merit to the defendant's argument regarding the judge's instruction concerning the voluntariness of the defendant's statements and the lack of Miranda warnings.

*Judgments affirmed.*

*Order denying motion for
new trial affirmed.*

---

[16]The defendant further complains that the judge contravened the spirit of *Harris* v. *Commonwealth*, 371 Mass. 478, 481 n.3 (1976), which stated that the better practice is for a judge not to reveal that a judicial finding of voluntariness has been made, for fear of prejudicing the jury on that issue. Here, the judge instructed that the defendant was not in custody, which is not the same as stating that her statements had been found to be voluntary.