# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
February 7, 2013 Session

## STATE OF TENNESSEE v. WILLIAM DARELLE SMITH

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Davidson County**
**No. 2007-C-2675      Seth Norman, Judge**

---

**No. M2010-01384-SC-R11-CD - Filed September 10, 2013**

---

This appeal concerns the appropriate response when a trial court learns during a jury's deliberations that a juror exchanged Facebook messages with one of the State's witnesses during the trial. A criminal court in Davidson County declined the defendant's request to hold a hearing to question the juror and the witness to ascertain whether the communications required a new trial. The Court of Criminal Appeals concluded that the trial court had not erred by declining the defendant's request for a hearing. *State v. Smith*, No. M2010-01384-CCA-R3-CD, 2012 WL 8502564 (Tenn. Crim. App. Mar. 2, 2012). We disagree and, therefore, vacate the judgment and remand the case for a hearing consistent with this opinion.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal Appeals Vacated and Remanded**

WILLIAM C. KOCH, JR., J., delivered the opinion of the Court, in which GARY R. WADE, C.J., JANICE M. HOLDER, CORNELIA A. CLARK, and SHARON G. LEE, JJ., joined.

Emma Rae Tennent (on appeal), Joan A. Lawson and J. Michael Engle (at trial), Nashville, Tennessee, for the appellant, William Darelle Smith.

Robert E. Cooper, Jr., Attorney General and Reporter; William E. Young, Solicitor General; Brent C. Cherry, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Chris Buford and Katy Miller, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I.**

On June 4, 2007, Zurisaday Villanueva's body was discovered on the side of the road near the Ashland City exit on Briley Parkway in Nashville. She had been shot twice. Investigators found two .9 millimeter shell casings near Ms. Villanueva's body, and the area around the body reflected that there had been a struggle. The investigation led the authorities to William Darelle Smith, with whom Ms. Villanueva had been living.

A Davidson County grand jury indicted Mr. Smith for the first degree murder of Ms. Villanueva. Before jury selection began on March 8, 2010, the trial court told the prospective jurors:

> Over the country of late . . . there's been some difficulty and it's
> going to force a change in the law with regard to jurors taking
> their cell phone and texting and trying to find out about a trial or
> things like that. That would be highly improper on a juror's part
> to do anything like that. As I say, you're required to make your
> decision solely upon the law and the evidence as you hear it in
> the courtroom.

During the jury-selection process, both the trial court and the attorneys questioned the prospective jurors about whether they knew the defendant, the prosecutors, the defense attorneys, or several of the investigating officers. Three of the prospective jurors who were eventually seated on the jury were employed at the Vanderbilt University Medical Center.[1] Although the attorneys were aware that Dr. Adele Lewis, a medical examiner who had trained at Vanderbilt, would be testifying for the State, they asked none of the jurors, not even the three jurors affiliated with Vanderbilt, whether they knew Dr. Lewis.

After the jury was seated, the trial court provided preliminary instructions. As part of these instructions, the trial court stated:

> During the course of the trial, you should not talk with any
> witnesses, defendants, or attorneys involved in this case. Please
> do not talk with them about any subject whatsoever. You may
> see them in the hallway, on an elevator, or at some other

---

[1]These jurors included a physician, a registered nurse, and Glenn Scott Mitchell, a grants manager.

location. If you do, perhaps the best standing rule is not to say anything.[2]

During the trial, Mr. Smith's cousin testified that Mr. Smith told her Ms. Villanueva pulled a pistol on him during an argument and the pistol "went off" during the struggle. She also testified that Mr. Smith told her that the pistol fired a second time when he was trying to move Ms. Villanueva's body. Mr. Smith's girlfriend testified that Mr. Smith told her he had killed Ms. Villanueva but that he was not sure what had happened. In addition to this testimony, the State introduced evidence that the authorities had found Ms. Villanueva's blood in an automobile driven by Mr. Smith and owned by Mr. Smith's father.

Dr. Lewis, the assistant medical examiner who performed Ms. Villanueva's autopsy, testified that Ms. Villanueva had been shot twice, once in the chest and once in the back of the head. While Dr. Lewis could not ascertain which shot had been fired first, she stated that Ms. Villanueva could have survived the chest wound with proper medical attention but that she would not have survived the head wound. She also testified that the shots had been fired from an "indeterminate range" and that she found no evidence that the muzzle of the pistol had been held against Ms. Villanueva's skin. Dr. Lewis concluded that Ms. Villanueva's death was a homicide.

The State called one final witness following Dr. Lewis and then rested. After the trial court denied Mr. Smith's motion for a judgment of acquittal, the defense rested, and the parties made their closing arguments. The proceedings were then adjourned for the day.

When the trial resumed on March 10, 2010, the trial court charged the jury and then instructed the jury to begin its deliberations. Approximately one hour after deliberations began, the trial judge received an email from Dr. Lewis regarding communications that Juror

---

[2]This was the only time this specific admonition was given to the jury during this case. The jury was not sequestered, and when the jury was excused for the day on March 8 and 9, 2010, the trial court reminded the jurors to remember its "admonitions" or "instructions." The trial court's final instructions immediately preceding the jury's deliberations did not include a warning against communications between the jurors and the defendant, the attorneys, the witnesses, or other third parties or a warning against the use of electronic technologies.

Mitchell had initiated with her on Facebook following her testimony on March 9, 2010.[3] The subject of Dr. Lewis's email was "Facebook," and the email stated:

> Judge Norman,
>
> I can't send you actual copies of the emails since Facebook is blocked from my computer here at work, but here is a transcript:
>
> Scott Mitchell: "A-dele!! I thought you did a great job today on the witness stand . . . I was in the jury . . . not sure if you recognized me or not!! You really explained things so great!!"
>
> Adele Maurer Lewis: "I was thinking that was you. There is a risk of a mistrial if that gets out."
>
> Scott Mitchell: "I know . . . I didn't say anything about you . . . there are 3 of us on the jury from Vandy and one is a physician (cardiologist) so you may know him as well. It has been an interesting case to say the least."
>
> I regret responding to his email at all, but regardless I felt that this was a fairly serious violation of his responsibilities as a juror and that I needed to make you and General Miller aware. I did not recognize the above-referenced cardiologist or any other jurors.
>
> Adele Lewis, MD

We do not know exactly when or how the trial judge told the attorneys about Dr. Lewis's email, but the record reflects that the judge told the lawyers about the email at some point. We also do not know whether the judge and the attorneys discussed the email during the jury's deliberations or what occurred during these discussions if they took place.

---

[3]Because the trial court did not inquire further into the nature of Juror Mitchell's postings on Dr. Lewis's Facebook page, the record does not reflect whether his communications were public postings which others could see and comment on or whether they were private messages from one Facebook user to another. *See* Ryan A. Ward, Note, *Discovering Facebook: Social Network Subpoenas and the Stored Communications Act*, 24 Harv. J.L. & Tech. 563, 571-74 (2011) (discussing the differences between public postings and private messages on social networking sites).

Once their deliberations were finished, the jury returned to the courtroom and announced that it found Mr. Smith guilty of first degree murder. Immediately after the trial court excused the jury, the following exchange occurred between Mr. Smith's counsel and the trial judge:

> MR. ENGLE: Your honor, I wondered if, before the jury departs the courthouse, if given the events of this morning it would be appropriate if [t]he Court inquired of this particular juror regarding any information that he might have acquired other than what has been made available to [t]he Court?

> THE COURT: No, I'm satisfied with the communication that I have gotten from Dr. Lewis with regard to the matter. [She] filled us in fully on the matter and [she] told me that is exactly what was said and I am satisfied with it.

The trial judge then sentenced Mr. Smith to life in prison.

Mr. Smith moved for a new trial. Among other grounds, he argued he was denied a fair trial because the court forbade him from questioning Juror Mitchell about his exchange with Dr. Lewis and any other possible violations of the jury's instructions. The trial court denied the motion for a new trial without comment.

Mr. Smith raised the issue again on appeal. The Court of Criminal Appeals characterized the Facebook exchange as "mere interactions" between a juror and a third person, and upheld the trial court's decision not to question Juror Mitchell. The court reasoned that "[t]he trial court has the discretion to determine whether a jury has acted impartially." *State v. Smith*, No. M2010-01384-CCA-R3-CD, 2012 WL 8502564, at *11 (Tenn. Crim. App. Mar. 2, 2012).

Judge Woodall wrote a separate concurring opinion. He emphasized that "[d]irect communication by a juror to a witness during the course of a trial," including a Facebook message, "could never be considered appropriate." *State v. Smith*, 2012 WL 8502564, at *11 (Woodall, J., concurring). He also expressed concern that "both the witness and the juror understood that the communication was improper" and that the trial court failed to conduct a hearing to question Juror Mitchell and Dr. Lewis under oath "concerning the possibility of any other similar communication during the trial, and to [admonish them] in open court for their improper conduct." *State v. Smith*, 2012 WL 8502564, at *11-12 (Woodall, J., concurring). Judge Woodall also stressed that "[c]ourts must be vigilant to insure that there is never 'prejudice to the judicial process' . . . caused by improper communications from or

to jurors during the course of a trial." *State v. Smith*, 2012 WL 8502564, at *12 (Woodall, J., concurring) (quoting Tenn. R. App. P. 36(b)).

## II.

The right to a trial by jury in both civil and criminal cases is a foundational right protected by both the federal and state constitutions.[4] Far from being a mere procedural formality, jury trials provide the citizens with the means to exercise their control over the Judicial Branch in much the same way that the right to vote ensures the citizens' ultimate control over the Executive and Legislative Branches. *Walsh v. State*, 166 S.W.3d 641, 649 (Tenn. 2005) (quoting *Blakely v. Washington*, 542 U.S. 296, 305-06 (2004)).

The right to a jury trial envisions that all contested factual issues will be decided by jurors who are unbiased and impartial. *Ricketts v. Carter*, 918 S.W.2d 419, 421 (Tenn. 1996); *Wolf v. Sundquist*, 955 S.W.2d 626, 629 (Tenn. Ct. App. 1997). In criminal cases, "[t]he jury is the property of neither a defendant nor the State." *State v. Smith*, 857 S.W.2d 1, 20 (Tenn. 1993). Thus, both the defendant and the State are entitled to a fair trial by an unbiased and impartial jury. *Boyd v. State*, 82 Tenn. 161, 168 (1884); *State v. Goltz*, 111 S.W.3d 1, 4 (Tenn. Crim. App. 2003) (quoting *Walden v. State*, 542 S.W.2d 635, 637 (Tenn. Crim. App. 1976)); *see also Toombs v. State*, 197 Tenn. 229, 231-32, 270 S.W.2d 649, 650 (1954). An unbiased and impartial jury is one that begins the trial with an impartial frame of mind, that is influenced only by the competent evidence admitted during the trial, and that bases its verdict on that evidence. *Durham v. State*, 182 Tenn. 577, 584, 188 S.W.2d 555, 558 (1945); *see also State v. Adams*, ___ S.W.3d ___, ___, 2013 WL 2102683, at *3 (Tenn. May 16, 2013).

Trial courts must ensure the integrity of the jury system by holding jurors accountable to the highest standards of conduct. *State v. Jackson*, 173 S.W.3d 401, 411 (Tenn. 2005). Accordingly, courts must discharge any juror who, for any reason, becomes disqualified to perform his or her duty. *Ricketts v. Carter*, 918 S.W.2d at 422; *Boyd v. State*, 82 Tenn. at 167; *Walden v. State*, 542 S.W.2d at 637. Discharging this obligation not only protects the fairness of the trial itself, but also promotes and preserves the public's confidence in the fairness of the system. *State v. Bondurant*, 4 S.W.3d 662, 668 (Tenn. 1999) (quoting *State v. Lynn*, 924 S.W.2d 892, 898 (Tenn. 1996)); *Wade v. Ordway*, 60 Tenn. 229, 243-44 (1872); *see also Shew v. Bailey*, 37 Tenn. App. 40, 54-55, 260 S.W.2d 362, 368 (1951).

---

[4]*See* U.S. Const. amends. VI & VII; Tenn. Const. art. I, §§ 6, 9.

## III.

Like judges, jurors must be – and must be perceived to be – disinterested and impartial. *See State v. Hester*, 324 S.W.3d 1, 51 (Tenn. 2010); *Gribble v. Wilson*, 101 Tenn. 612, 615, 49 S.W. 736, 736 (1899). Because a fair trial requires that jurors base their verdict solely on the evidence introduced at trial, *State. v. Adams*, ___ S.W.3d at ___, 2013 WL 2102683, at *3; *State v. Davidson*, 121 S.W.3d 600, 612-13 (Tenn. 2003); *Citizens' St. R.R. Co. v. Burke*, 98 Tenn. 650, 653, 40 S.W. 1085, 1085 (1897), Tennessee courts have long employed sequestration to protect jurors from outside influences. *See State v. Bondurant*, 4 S.W.3d at 670-71.

While courts have a duty to prevent jurors, "charged with the life or liberty of a citizen, from mingling with the community during their deliberations," *Cochran v. State*, 26 Tenn. (7 Hum.) 544, 547 (1847), it is virtually impossible to shield jurors from every contact and influence that might theoretically affect their decision. *Smith v. Phillips*, 455 U.S. 209, 217 (1982); *Rowe v. State*, 30 Tenn. (11 Hum.) 491, 493 (1851) ("[H]owever desirable it may be to keep a jury as much as possible out of sight and apart from the others, we know that it is impossible to do so entirely."); *Caldararo ex rel. Caldararo v. Vanderbilt Univ.*, 794 S.W.2d 738, 743-44 (Tenn. Ct. App. 1990). Accordingly, we noted over 160 years ago that the best courts can do is "to have the jury kept together; to see that none speak to them, and to secure them against any attempt of others to tamper with them." *Rowe v. State*, 30 Tenn. at 494.

Jury sequestration is now the exception rather than the general rule in Tennessee. However, the circumstances and considerations that originally prompted sequestration remain valid today. To assure that juries base their decisions on the evidence properly admitted during the trial, it is necessary to limit the ability of third parties to influence jurors and to limit the ability of jurors to initiate extra-judicial communications with third parties.

When a trial court learns that an extra-judicial communication between a juror and a third-party has occurred, the court must take steps to assure that the juror has not been exposed to extraneous information or has not been improperly influenced. In most circumstances, the appropriate first step is to conduct a hearing in open court in the presence of the defendant to place the facts in the record and to determine on the record whether cause exists to find that the juror should be disqualified. *Whitmore v. Ball*, 77 Tenn. 35, 37 (1882); *Smith v. State*, 566 S.W.2d 553, 559-60 (Tenn. Crim. App. 1978).[5] As the Court of Appeals

_____

[5]Circumstances can arise in which the juror's extra-judicial communication with a third-party or exposure to improper influence will not be discovered until after the jury has rendered its verdict and has been discharged. In that case, the issue must be raised in a properly supported motion for a new trial. When

(continued...)

has noted, when misconduct involving a juror is brought to a trial court's attention, "it [is] well within [the judge's] power and authority to launch a full scale investigation by summoning . . . all the affiants and other members of the jury, if need be, with a view of getting to the bottom of the matter, and this, if necessary, upon [the judge's] own motion." *Shew v. Bailey*, 260 S.W.2d at 368.

Because of the potentially prejudicial effect of a juror's receipt of extraneous information, the State bears the burden in criminal cases either to explain the conduct of the juror or the third party or to demonstrate how the conduct was harmless. Error is harmless when "it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *State v. Brown*, 311 S.W.3d 422, 434 (Tenn. 2010) (quoting *Neder v. United States*, 527 U.S. 1, 15 (1999)).

When a jury is not sequestered, something more than a showing of an extra-judicial communication between a juror and a third party is required to shift the burden to the State. There must also be evidence that, as a result of the extra-judicial communication, some extraneous prejudicial fact or opinion "was imported to one or more jurors or some outside improper influence was brought to bear on one or more jurors." *State v. Blackwell*, 664 S.W.2d at 689; *see also State v. Meade*, 942 S.W.2d 561, 565 (Tenn. Crim. App. 1996) (quoting *State v. Clinton*, 754 S.W.2d 100, 103 (Tenn. Crim. App. 1988)). Thus, when it is shown that a juror has been exposed to extraneous prejudicial information or an improper influence, a rebuttable presumption arises and the burden shifts to the State to explain the conduct or demonstrate that it was harmless. *State v. Adams*, ___ S.W.3d at ___, 2013 WL 2102683, at *4; *Walsh v. State*, 166 S.W.3d 641, 647 (Tenn. 2005).

**IV.**

The majority of our decisions regarding extra-judicial communications between jurors and third parties were handed down long before the advent of the Internet, social media, smart phones, and tablet computers. *See, e.g., Odle v. State*, 65 Tenn. 159 (1873). These cases involved one-on-one communications that often occurred in person. David P. Goldstein, *The Appearance of Impropriety and Jurors on Social Networking Sites: Rebooting the Way Courts Deal with Juror Misconduct*, 24 Geo. J. Legal Ethics 589, 594 (2011) ("Goldstein") (citing Dennis Edwards, Jr., *A Judge's Review of Juror Misconduct*, 27 How. L.J. 1519, 1537-43 (1984)).

---

[5](...continued)
the issue is raised in a motion for a new trial, the trial court should permit the parties to present evidence before deciding whether the challenged juror was disqualified to serve. *See State v. Blackwell*, 664 S.W.2d 686, 688-89 (Tenn. 1984).

Today, however, new communications technology has exponentially increased the risk that jurors will conduct research and investigate the law and facts on their own. *See* David E. Aaronson & Sydney M. Patterson, *Modernizing Jury Instructions in the Age of Social Media*, 27 Crim. Just., Winter 2013, at 26, 27; John G. Browning, *When All That Twitters Is Not Told: Dangers of the Online Juror*, 73 Tex. B.J. 216, 217 (2010); Caren Myers Morrison, *Can the Jury Trial Survive Google?*, 25 Crim. Just., Winter 2011, at 4, 5. It has also increased the risk of extra-judicial communications between jurors and third parties. *See State v. Goupil*, 908 A.2d 1256, 1262-67 (N.H. 2006); *Commonwealth v. Werner*, 967 N.E.2d 159, 167 (Mass. App. Ct. 2012); Goldstein, 24 Geo. J. Legal Ethics at 589-90; *see also* Amy J. St. Eve & Michael A. Zuckerman, *Ensuring an Impartial Jury in the Age of Social Media*, 11 Duke L. & Tech. Rev. 1, 8-11 (2012) ("St. Eve & Zuckerman").

Addressing the nationwide problem facing both the federal and state courts, Judge Julio Fuentes of the United States Court of Appeals for the Third Circuit has recently noted:

> Not unlike a juror who speaks with friends or family members about a trial before the verdict is returned, a juror who comments about a case on the internet or social media may engender responses that include extraneous information about the case, or attempts to exercise persuasion and influence. If anything, the risk of such prejudicial communication may be greater when a juror comments on a blog or social media website than when she has a discussion about the case in person, given that the universe of individuals who are able to see and respond to a comment on Facebook or a blog is significantly larger.

*United States v. Fumo*, 655 F.3d 288, 305 (3d Cir. 2011), *as amended* (Sept. 15, 2011). Writing separately, Judge Richard Nygaard also observed that jurors are tweeting, "conducting factual research online, looking up legal definitions, investigating likely prison sentences for a criminal defendant, visiting scenes of crimes via satellite images, blogging about their own experiences and sometimes even reaching out to parties and witnesses through 'Facebook friend' requests." Social media websites and applications have "made it quicker and easier to engage more privately in juror misconduct, compromise the secrecy of [jury] deliberations, and abase the sanctity of the decision-making process." *United States v. Fumo*, 655 F.3d at 332 (Nygaard, J., concurring and dissenting).

Even though technology has made it easier for jurors to communicate with third parties and has made these communications more difficult to detect, our pre-internet precedents provide appropriate principles and procedures to address extra-judicial communications, even when they occur on social media websites and applications such as

Facebook.  Accordingly, we will apply the principles and procedures discussed in *State v. Adams*,___ S.W.3d at ___, *Walsh v. State*, 166 S.W.3d at 646-50, and *State v. Blackwell*, 664 S.W.2d at 688-89, to this case.

## V.

The first step of the analysis is to determine whether the trial court received reliable and admissible evidence that an extra-judicial communication between a juror and a third party occurred.  Here, Dr. Lewis's email to the trial court provides proof that such a communication between her and Juror Mitchell did, in fact, occur.  In addition, because the information in the email related to potentially prejudicial external influences,[6] rather than the jury's deliberations or the juror's thought processes, the contents of the email were admissible under Tenn. R. Evid. 606(b).  *State v. Adams*, ___ S.W.3d at ___, 2013 WL 2102683, at *4.  This evidence was sufficient to trigger the rebuttable presumption of prejudice to Mr. Smith, thereby requiring the State to explain the conduct or to demonstrate that it was harmless.

This appeal focuses on the trial court's decision not to conduct a hearing or to otherwise inquire into the circumstances after being informed of Juror Mitchell's Facebook communications with Dr. Lewis.  While appellate courts review a trial court's decision regarding the disqualification of a particular juror using the abuse of discretion standard, *see State v. Goltz*, 111 S.W.3d at 5, we have determined that the potential risk of prejudice to the judicial process requires appellate courts to review de novo a trial court's decision not to conduct a hearing or to inquire further when the court receives reliable information that a juror has had extra-judicial communications with a third party during the trial.

When the trial court received competent and reliable evidence that an extra-judicial communication between a juror and a State's witness had taken place during the trial, it was required to do more than simply inform the parties about the email and then await the jury's verdict.  The trial court erred by failing to immediately conduct a hearing in open court to obtain all the relevant facts surrounding the extra-judicial communication between Dr. Lewis and Juror Mitchell.  This hearing may very well have necessitated calling both Juror Mitchell and Dr. Lewis to testify under oath about their relationship and the effect of the communication on Juror Mitchell's ability to serve as a juror.  Because the contents of the email focus only on events occurring before the jury received its instructions and retired to deliberate, the court may also have been required to call other members of the jury to determine whether Juror Mitchell shared any extraneous information with other jurors.

---

[6]Potentially prejudicial external influences include a juror's communications with non-jurors about the case.  *Carruthers v. State*, 145 S.W.3d 85, 92 (Tenn. Crim. App. 2003) (quoting *Caldararo ex rel. Caldararo v. Vanderbilt Univ.*, 794 S.W.2d at 742)).

*State v. Blackwell* illustrates the proper approach to be taken when other jurors may possess relevant information. Following his conviction for selling alcoholic beverages to a minor, Ronnie Blackwell filed a motion for a new trial stating that two jurors had disclosed that one of their fellow jurors had talked with the minor's mother in the hallway during the trial and then had told the other jurors during their deliberations that the defendant was guilty. *State v. Blackwell*, 664 S.W.2d at 688. The trial court permitted the two jurors to testify during the hearing on the motion for a new trial. *State v. Blackwell*, 664 S.W.2d at 688. This Court granted Mr. Blackwell a new trial after finding that the evidence provided by the two jurors demonstrated both that a private extra-judicial communication with a juror had occurred and that this communication resulted in the jury receiving extraneous prejudicial information. *State v. Blackwell*, 664 S.W.2d 689-90.

Not every extra-judicial communication between a juror and a third-party requires the court to disqualify the juror, declare a mistrial, or grant a new trial. These remedies are required only when the extra-judicial communication is prejudicial to the defendant and is not harmless error. This is true even when the non-juror is a party, a witness, or someone otherwise interested in the case. *See State v. Pappas*, 754 S.W.2d 620, 625 (Tenn. Crim. App. 1987) (juror's contact with victim was an "idle comment" that did not prejudice the proceedings).

Because the trial court failed to hold a hearing or to make findings of fact and conclusions of law, this record is inadequate for us to determine whether the extra-judicial communication between Dr. Lewis and Juror Mitchell was not prejudicial. We do not know, for example, the full nature of their relationship and whether their relationship would have required Juror Mitchell's disqualification.[7] Because neither Juror Mitchell nor any of his fellow jurors were questioned, the record contains no information regarding whether Juror Mitchell passed along extraneous prejudicial information to the other members of the jury.

When a trial court fails to hold an evidentiary hearing to inquire into juror misconduct, the proper remedy is to remand the case for such a hearing. *See Remmer v. United States*, 347 U.S. 227, 229-30 (1954); *United States v. Guthrie*, 387 F.2d 569, 572 (4th Cir. 1967); *State v. Roman*, 817 A.2d 100, 107 (Conn. 2003). At the hearing, questioning of the juror should include: "(1) the subject matter of the contact, (2) to whom it was directed, (3) the medium of the exchange, (4) whether any responses were received, and (5) the content of the communications." *See* J. Paul Zimmerman, *A Practical Guide to the Development of Jury Charges Regarding Social Media*, 36 Am. J. Trial Advoc. 641, 642 (2013). On remand, if the hearing reveals that juror misconduct resulted in prejudice, a new trial must be granted. *See Remmer v. United States*, 347 U.S. at 230; *Caliendo v. Warden of California Men's*

---

[7]Persons whose associations, experiences, and interests could sway their judgment have been historically excused from jury service. *See Durham v. State*, 188 S.W.2d at 559.

-11-

*Colony,* 365 F.3d 691, 699 (9th Cir. 2004); *Simants v. State*, 277 N.W.2d 217, 223 (Neb. 1979).

Accordingly, the portion of the trial court's order that denies Mr. Smith's motion for a new trial based on Juror Mitchell's improper extra-judicial communication with Dr. Lewis is vacated. The case is remanded to the trial court to conduct a hearing to determine whether Juror Mitchell's Facebook communication with Dr. Lewis disqualified him from continuing to serve on Mr. Smith's jury. Following this hearing, the trial court shall make findings of fact and conclusions of law regarding whether the challenged communication requires Juror Mitchell's disqualification or whether Juror Mitchell's misconduct was harmless beyond a reasonable doubt. If, for any reason, the trial court is unable to conduct a full and fair hearing with regard to Juror Mitchell's improper extra-judicial communication with Dr. Lewis, then the trial court shall grant Mr. Smith a new trial.

## VI.

The American judicial system "depends upon public confidence in the jury's verdict." *United States v. Siegelman*, 640 F.3d 1159, 1186 (11th Cir. 2011). Commentators are now warning that "the unseemliness of jurors using Facebook or Twitter to discuss their jury service may spawn public doubt about the capacity of the modern jury system to achieve justice." St. Eve & Zuckerman, 11 Duke L. & Tech. Rev. at 12. Being selected to serve on a jury is "the highest obligation of citizenship" and a privilege. *Walsh v. State*, 166 S.W.3d at 650 (quoting *Carruthers v. State*, 145 S.W.3d at 93). But the "fundamental right of a fair trial cannot be guaranteed if jurors fail to take their obligations seriously and disregard their oaths to follow the court's rules." *People v. Rios*, 907 N.Y.S.2d 440 (N.Y. Sup. Ct. 2010), *aff'd*, 930 N.Y.S.2d 180 (N.Y. App. Div. 2011).

The facts of this case demonstrate that this technological age now requires trial courts to take additional precautions to assure that jurors understand their obligation to base their decisions only on the evidence admitted in court. Trial courts should give jurors specific, understandable instructions that prohibit extra-judicial communications with third parties and the use of technology to obtain facts that have not been presented in evidence.[8] Trial courts

---

[8]After a juror wrote postings about a trial on Facebook, the Court of Appeals of Massachusetts noted:

Apparently, even these instructions were not enough to keep jurors from at least alluding to their jury service on social media Web sites. More explicit instructions about the use of social media and the Internet may therefore be required. Instructions not to talk or chat about the case should expressly extend to electronic communications and social media, and discussions about the use of the Internet should expressly go beyond prohibitions on research. Jurors should not research, describe, or discuss the case on- or off-line. Jurors

(continued...)

should clearly prohibit jurors' use of devices such as smart phones and tablet computers to access social media websites or applications to discuss, communicate, or research anything about the trial.[9]  In addition, trial courts should inform jurors that their failure to adhere to these prohibitions may result in a mistrial and could expose them to a citation for contempt. Trial courts should deliver these instructions and admonitions on more than one occasion.[10]

## VII.

Because the trial court erred by failing to hold an evidentiary hearing to ascertain the nature and extent of the improper communications exchanged between Juror Mitchell and Dr. Lewis, we vacate the judgment of the Court of Criminal Appeals and the order of the trial court denying Mr. Smith's motion for a new trial on the ground of juror bias and remand this

---

[8](...continued)
must separate and insulate their jury service from their digital lives.

*Commonwealth v. Werner*, 967 N.E.2d at 168 (footnotes omitted).

On January 28, 2010, the federal Judicial Conference Committee on Court Administration and Case Management issued model jury instructions to help deter jurors from using electronic technologies to research or communicate about cases on which they serve. *See* Committee on Court Administration and Case Management of the Judicial Conference of the United States, Memorandum: Juror Use of Electronic Communication Technologies (2010), *available at* http://federalevidence.com/downloads/blog/2010/ Memorandum.On.Juror.Use.Of.Electronic.Communication.Technologies.pdf.  A majority of the judges responding to a 2011 survey by the Federal Judicial Center stated that they were taking preventative measures to deter jurors' misuse of electronic technologies in their courtrooms.  These measures included the model jury instructions or similar instructions from other sources. *See* Meghan Dunn, *Jurors' Use of Social Media During Trials and Deliberations* 5-7 (2011) ("Federal Judicial Center Survey"), *available at* http://www.fjc.gov/public/pdf.nsf/lookup/dunnjuror.pdf/$file/dunnjuror.pdf.

[9]In 2010, after the trial in this case was completed, the Committees on Pattern Jury Instructions approved instructions for both criminal and civil proceedings intended to deter jurors from using electronic technologies to conduct legal or factual research or to communicate about the cases on which they were serving. *See* 8 Tennessee Pattern Jury Instructions-Civil §§ 1.02, 15.20 (10th ed. 2010); 7 Tennessee Pattern Jury Instructions-Criminal §§ 1.09, 43.14 (14th ed. 2010).  These instructions were patterned after the instructions prepared by the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

[10]Amanda McGee, Note, *Juror Misconduct in the Twenty-First Century: The Prevalence of the Internet and Its Effect on American Courtrooms*, 30 Loy. L.A. Ent. L. Rev. 301, 317 (2010).  A majority of the judges responding to the Federal Judicial Center's 2011 survey who stated that they used the model instructions or instructions from other sources reported that they used the instructions in both civil and criminal trials and that they instructed the jury on the issue both before the trial began and again before deliberations began.  Federal Judicial Center Survey, supra n.8, at 6.

case to the trial court for an evidentiary hearing consistent with this opinion.  The costs of this appeal are taxed to the State of Tennessee.


_____
WILLIAM C. KOCH, JR., JUSTICE