# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
June 25, 2013 Session

## STATE OF TENNESSEE v. NICHOLAS WYATT BARISH

**Appeal from the Criminal Court for Knox County**
**No. 97586  Bob R. McGee, Presiding Judge**

---

**No. E2012-01353-CCA-R3-CD - Filed September 27, 2013**

---

After a trial by jury, the defendant was convicted of first degree (felony) murder as well as one count of especially aggravated robbery, a Class A felony.  Prior to trial, the defendant also pled guilty to one count of burglary of an automobile, a Class E felony.  The defendant was automatically sentenced to life in prison for the felony murder, and he received concurrent sentences as a Range I, standard offender of eighteen years for the especially aggravated robbery and one year for the burglary of the automobile.  On appeal, the defendant claims that the evidence is insufficient to support his convictions and that the trial court erred by instructing the jury that they could not consider lesser-included offenses until after they reached a unanimous decision with respect to the first degree murder charge.  We find these claims to lack merit.  In addition, the defendant claims that the trial judge's *ex parte* contact with the jury during its deliberations exerted an improper influence on jury's verdict.  Upon review, we conclude that on the unique facts of this case public confidence in jury's verdict has been so undermined as to necessitate reversal of the defendant's first degree (felony) murder conviction.  We affirm the defendant's remaining convictions and sentences and remand the case to the trial court for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Reversed in Part, Affirmed in Part, and Remanded.**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, and ROGER A. PAGE, JJ., joined.

Bruce E. Poston and Jamie Poston, Knoxville, Tennessee, for the appellant, Nicholas Wyatt Barish.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; Randall Nichols, District Attorney General; and Kevin Allen, Assistant District Attorney

General, for the appellee, State of Tennessee.

**OPINION**

**FACTS AND PROCEDURAL HISTORY**

On July 12, 2011, the defendant, Nicholas Wyatt Barish, was indicted on three alternative counts of felony murder of the victim, Matthew E. Proctor, in violation of Tennessee Code Annotated 39-13-202. Count I alleged that the defendant killed the victim during the commission of a theft, Count II alleged that the defendant killed the victim during the commission of a robbery, and Count III alleged that the defendant killed the victim during the commission of a burglary. The defendant was also indicted on one count of especially aggravated robbery in violation of Tennessee Code Annotated section 39-13-403 and one count of burglary in violation of Tennessee Code Annotated section 39-14-402. The charges stemmed from the defendant's alleged treatment of the victim, his drug dealer and friend, on May 13, 2011. The defendant pled guilty to the burglary count prior to trial.

At the defendant's trial on February 27, 2012, through March 1, 2012, the State presented the testimony of several witnesses during its case-in-chief. Ms. Susano Sanchez testified that in May of 2011, she worked for a boat detailing company with the victim, but she did not know him well. She testified that in the days before the victim's death, she and the victim were working together on a boat detailing job, waxing a particular sailboat. She testified that she noticed that the victim received numerous phone calls and was on his phone frequently. She testified that when she asked the victim why he was on the phone so often, the victim replied that he was selling marijuana. She testified that the victim showed her a small silver box containing numerous bills of various denominations. She testified that the victim told her that the box contained several thousand dollars.

Ms. Keri Weatherford testified that she was in a romantic relationship with the victim and that they were "best friends and lovers." She testified that although she was bisexual and was in an "open" relationship with the victim, she had never known the victim to be with a man and described him as "pretty straight." She testified that during their relationship, the two of them abused prescription painkillers by ingesting and snorting them. She testified that she earned her money by tending bar, while the victim earned his money by selling prescription pills. She testified that he bought the pills in large quantities and then sold them for a higher price. She testified that he communicated with his clients by cell phone and that his cell phone never left his hand or his pocket. She testified that the victim would keep the proceeds from his drug sales in a small tin box, which he hid at night in the yard outside of

his parents' house (where he stayed) so that he would not have to take it inside.

Ms. Weatherford testified that the victim liked to dress well and always wore matching clothing. She testified that he did not like for his clothing to get dirty. She testified that the victim drove a white BMW 300 series convertible, which he always cared for and kept clean. She testified that he habitually locked the doors to his car, and she had never known him to leave the car doors unlocked or to leave his keys in the car. She testified that the victim was an excellent swimmer as well as a scuba diver. She testified that the victim would never go fishing or clean fish, however, because he did not like to get dirty. She testified that the victim was particularly concerned about keeping his shoes clean.

Ms. Weatherford testified that although the victim was six feet and nine inches tall, he never got into fights, and on one occasion, he had even allowed an individual in a bar to hit him. She described the victim as being too gentle to fight. She testified that on the day that the victim died, she saw him at a bar called "Bullfeathers," and the victim did not have any cuts or abrasions on him at that time (other than a bump he received to his head when he forgot to duck as he left out the door).

Ms. Weatherford testified that on the evening of his death, the victim approached her and told her that he had to "make a run" and that he would be back in fifteen minutes. She testified that she understood this to mean that the victim was going to sell some pills. She testified that the victim did not close his tab at the bar. She testified that she never saw him again. As the evening continued, she kept drinking and texting him, and eventually she became concerned that the victim had been arrested.

Ms. Weatherford testified that she was familiar with the defendant, and she also knew the defendant's father and brother. She testified that the victim was friends with the defendant, and sometimes the defendant would call the victim when he was "dope sick," and the victim would "front" drugs to him.[1] She testified that she knew that the defendant had dated girls in the past. She testified that she was aware of no "relationship" between the defendant and the victim other than the one that she had just described.

On cross-examination, Ms. Weatherford denied that the defendant had introduced her to any girls. She also denied that the victim was gay. She testified that she had recently been to "rehab" and had gotten "clean" from drugs while she was there. On redirect examination,

---

[1] "Fronting" is a well-known street-slang term, generally used in urban language to indicate the provision of drugs to an individual with the expectation of later repayment. Mid-level drug suppliers will often "front" drugs to low-level suppliers, who will then sell the drugs and use the proceeds to repay the original debt before repeating the process over again.

Ms. Weatherford testified that she was familiar with the area where the victim's body had been found and that it was located less than two miles away from the bar where they had been drinking.

Mr. Michael Mays, the records keeper for the Knox County Emergency Communication District 911, testified that he had a copy of a 911 call concerning the details of a body found floating in Turkey Creek on May 13, 2011. After the witness authenticated the record, the audio of the 911 call was played for the jury.

Mr. Jacob Wade Foster, a local fisherman, testified that he was fishing for catfish in the waters of Turkey Creek in West Knoxville around 11:15 p.m. on the evening in question. He testified that when he and his friend arrived at their usual fishing spot, they parked in the parking lot of a nearby power plant and noticed that there was a white convertible BMW with its top up and its windows down parked in a gravel spot where they normally would have parked. He testified that as they walked down to the water using flashlights, they saw what they initially thought was a highway barrel floating in water. As they drew closer, he saw a man's face "bob up" in the surf. After they initially ran away, he testified that he called 911. He testified that he did not disturb the crime scene in any way.

Mr. Christopher Lynn Marney testified that he was currently incarcerated for a probation violation. He testified that he had known the defendant for approximately eighteen years and that the two had been friends since high school. He testified that the defendant was heterosexual and to his knowledge had never been with a man. He testified that he was acquainted with the victim through the defendant and that the defendant and the victim would occasionally hang out in bars. He testified that he was aware that the defendant purchased pills from the victim.

Mr. Marney testified that he was informed of the victim's death by the defendant on Saturday, May 14, 2011. He testified that the following day, the defendant confided in him that the defendant had been one of the last people to see the victim alive. He testified that the defendant told him that he had obtained a few pills from the victim while he and the victim were behind the Domino's Pizza where the victim had worked. Mr. Marney testified that the defendant asked him to provide him with an alibi for the hours of 3:30 p.m. to 9:00 p.m. on the day in question. He testified that he and the defendant discussed in detail what he would tell the authorities that the defendant had been doing during those hours. He testified that the basic story was that he and the defendant were cooking, watching movies, and hanging out during the relevant time.

Mr. Marney testified that on the Monday or Tuesday following the victim's death, he was contacted by Detective Brad Hall and told to come in for an interview. He testified that

when he met with the detective, he told the detective the story that he and the defendant had developed together. He testified that the plan "failed miserably." He testified that the detective had a videotape depicting some of the defendant's activities on that day, and when the detective confronted him with that videotape, he admitted that he had been lying. He testified that, in reality, he had never been with the defendant on May 13, 2011.

On cross-examination, Mr. Marney testified that he had no personal knowledge concerning whether the victim had actually worked at Domino's Pizza. The witness also testified that although he "sp[un] top 40 music at a gay bar," he was "perfectly heterosexual." The witness testified that the defendant was "not the most masculine guy in the world." He testified that although he saw the defendant every day, on many nights he did not know where the defendant would spend the evening.

Ms. Mckenzie Alleman, a crime scene analyst with the Knox County Sheriff's Office, testified that she processed the crime scene in question. She authenticated numerous photographs of the crime scene, which were entered into evidence. The witness testified that the pictures detailed the location where the body was found, as well as a nearby grassy area containing a reddish-brown substance believed to be blood. She testified that she swabbed for DNA at the crime scene, including the area of rocks that appeared to have the presence of blood. In her photographs, the witness pointed out various rocks depicted therein that appeared to have been disturbed. The witness also pointed out several small cuts and abrasions that could be seen on the victim's body, especially his legs. She testified that the victim was not wearing shoes when he was retrieved from the water. The witness testified that the primary injury that she noted while at the crime scene was a large injury to the right side of the victim's head. She testified that the victim's wallet was recovered from his right rear pocket. She testified that there was no currency found in the victim's wallet or on his body. The witness testified that a pair of shoes were recovered from the waterway at the crime scene by a dive team.

Ms. Alleman also discussed photographs taken of the victim's vehicle. She testified that the driver's side window was partially open, but all of the remaining windows were closed. The witness testified that several small plastic baggies were discovered inside the victim's car. She testified that a container (specifically, a sprinkler head) containing thirty-eight unknown pills was located on the floor board behind the driver's seat by one of the other officers.

Ms. Alleman testified that she also confiscated evidence from the defendant's house pursuant to a search warrant. She testified that she recovered several small plastic baggies at the suspect's residence that appeared to be similar to those discovered in the victim's car. Ms. Alleman testified that during the search she took approximately 232 photographs of the

interior of the defendant's residence. In several of those photographs, she pointed out cobwebs and spiderwebs appearing on the fishing equipment discovered inside. Ms. Alleman testified that a cell phone was recovered from the defendant's residence, and that phone was missing its memory card. The witness also testified that a small silver metal box was discovered at the defendant's residence containing several Ziploc-style baggies.

On cross-examination, Ms. Alleman testified that there was no blood discovered on a hat found at the crime scene, which was the same brand as the other clothing worn by the victim. The witness testified that no fingerprints were found on the metal tin discovered at the defendant's residence. Ms. Alleman testified that the victim had a large earing in one of his ears. The witness and defense counsel also engaged in a discussion concerning the degree of the slope of the terrain leading down to the water where the victim's body was discovered.

Detective Brad Hall of the Knox County Sheriff's Office testified that he was involved in the investigation into the victim's death. He testified that based on certain information he received from Ms. Keri Weatherford, he obtained the phone records relating to the victim's phone from the victim's service provider. He later subpoenaed the defendant's phone records and examined these as well. Detective Hall testified that the records he reviewed revealed that on May 12, 2011, the victim made several phone calls to the defendant. On May 13, 2011, there were several additional calls made from the victim to the defendant and from the defendant to the victim. The records reflected that the last time the defendant communicated with the victim was at 7:48 p.m. Following that time, there was no record of either the victim or defendant ever attempting to call the other.

Detective Hall testified that he reviewed certain video camera footage taken from traffic cameras and from businesses' surveillance cameras located near the crime scene. After authenticating this footage, some of it was played for the jury. Detective Hall testified that from this footage, he was able to determine that the victim and defendant had each parked their car at a Domino's Pizza for two or three minutes at approximately 8:00 p.m., and they both left shortly afterward. He testified that the video reflected that both cars arrived at a parking area across the street from the crime scene at around 8:11 p.m. He testified that two figures, one wearing light clothing and the other wearing dark clothing, exited the respective vehicles belonging to the victim and the defendant and appeared to talk together for a minute or two. He testified that afterward, both figures crossed the road and went down an embankment. He testified that at 8:17 p.m., the figure in the light-colored clothing, who had exited the white BMW, appeared at the top of the embankment for a moment. Detective Hall testified that six and a half minutes later, the figure in dark clothing emerged from the embankment alone. Detective Hall testified that the figure in dark clothing, believed to be the defendant, was located at the crime scene for a total of approximately seventeen minutes.

Detective Dale Dantzler of the Knox County Sheriff's Office testified that he was the lead detective in the investigation into the victim's death. He testified that after investigating phone numbers associated with calls made to the victim's cell phone, he became interested in the defendant as a suspect. He testified that another officer drove through the defendant's neighborhood and observed a car matching the description of one that they had seen on surveillance video. He testified that this vehicle was distinctive because it had visible damage to its rear end.

Detective Dantzler testified that during his investigation he determined that the defendant's driver's license had been revoked. He testified that he ordered his units in the area to detain the defendant if they found him to be driving a vehicle with a revoked license. He testified that at some point on May 14, 2011, his officers did so. He testified that he traveled to the site of this traffic stop.

Detective Dantzler testified that the defendant was read his rights and signed a *Miranda* waiver. He testified that he taped his ensuing interview with the defendant. He authenticated a copy of this audiotape, which was played for the jury. At the end of this interview, an officer accompanied the defendant to look for the victim's cell phone. Detective Dantzler testified that this officer was able to recover the victim's cell phone with the assistance of the defendant. He testified that the victim's cell phone was "in pieces," had been out in the weather for several days, and was generally not in good shape when it was recovered.

Detective Dantzler testified that the defendant consented to a search of his residence. During that search, he observed a metal box sitting on the defendant's desk. Subsequently, he seized that metal box pursuant to a search warrant. On cross-examination, Detective Dantzler testified that during his interview, the defendant appeared to be nervous, and he stammered when he was asked if he had a girlfriend.

Dr. Christopher Lockmuller, the Deputy Medical Examiner for Knox County, testified that he performed an autopsy on the victim. He testified that the victim had five serious lacerations on the back of his head. He testified that the victim had bruising deep within his scalp in the area near the lacerations. He testified that he did not believe that these injuries could have been accidental, because there were four separate injured areas on the back of the victim's head reflecting four separate impact sites, and this type of repeated injury could not have occurred during a "trip and fall." He also observed a lack of corresponding injuries on the front and the back of the victim's body. He testified that the damage to the victim's skull could only have been caused by contact with a hard, unyielding object, such as a board, rock, or pipe. He testified that the injuries to the victim's skull would not have been fatal, and he ultimately concluded that the victim had drowned due to incapacitation resulting from blunt

force trauma to the head.

Dr. Lockmuller testified that the victim had additional scrapes and bruises on the front of his legs, his back, and on the back of one arm. He testified that there was also an injury pattern on the victim's left arm that included four parallel areas of bruising, which had the appearance of being the imprints of forefingers. He testified that such marks are typically made when fingers are firmly pressed into flesh. While he was on the stand, Dr. Lockmuller was shown several photographs of the victim's autopsy reflecting the victim's injuries. These photographs were entered into evidence.

Dr. Lockmuller testified that he drew blood from the victim and sent it off for a toxicology report. He testified that the victim's toxicology report reflected that he had oxycodone (a painkiller), Alprazolam (an anti-anxiety drug), and marijuana in his system.

In conclusion, Dr. Lockmuller testified that as a result of performing the victim's autopsy, he was able to conclude that the victim had been beaten in the back of the head, knocked unconscious, and placed or left in the water to drown. He testified that the victim's manner of death was a homicide.

During cross-examination, Dr. Lockmuller was shown a hat. Dr. Lockmuller opined that this hat was probably not on the victim's body when the head injuries occurred because it was not covered with blood. On redirect examination, Dr. Lockmuller testified that the human body could be injured through clothing without causing any damage to that clothing. Moreover, it was possible that any blood that might have been on the hat could have been washed away, depending on the amount of time that the hat had been in the water.

Following this testimony, the State rested, and defendant took the stand as the sole witness in his own defense. The defendant testified that he was thirty-two years old and was born in a small conservative town in Roane County, Tennessee. He testified that he had lived in Knoxville for ten to twelve years. He testified that although he ran around with many women, he was not having relationships with any of them because they were all gay. He testified that he is also gay, but he wanted to portray the image of a straight person to the public.

The defendant testified that a spoon and some syringes that had been found by police during a search of his residence belonged to him and that he used them for "banging pills." He testified that this practice involved crushing the pills up in a spoon, diluting the mixture with water, and shooting it intravenously. He testified that it provided a quicker, better high than ingesting the pills. He testified that all of the crowd that he ran around with were fellow drug users.

-8-

The defendant testified that he met the victim through the local bar scene and had known him for four or five years. He testified that the victim was his primary source of pills and was very successful as a drug dealer. He testified that when he wanted a pill, he would call the victim, and they would determine a time and place to meet. He testified that they would drive separate cars to the assigned location and that they had a number of regular meeting spots, such as the parking lots at Domino's Pizza, Kohl's, and Weigel's. Once they arrived at the meeting spot, one of them would go to the other one's car, and they would exchange money for drugs.

The defendant testified that over time, his relationship with the victim became sexual. He testified that he and the victim would have convenient sexual encounters, usually in the backseat of a car in a parking lot somewhere. He testified that he and the victim would also have sexual encounters at "the spot," which was the location under the bridge where the victim's body was discovered. He testified that they occasionally agreed to go there in order to have a different, better spot for sex than the backseat of a car.

The defendant testified that on May 12, 2011, he was "dodging" the victim because he owed the victim approximately $50 and did not have the money to repay him. He testified that he started calling the victim again on Friday, May 13, 2011, because he had gotten some money and needed another pill. He testified that the two met up at a location early in the day and made the exchange. He testified that he again called the victim later that evening, nearing 8:00 p.m., in order to get another pill. He testified that they agreed to meet next to the Domino's Pizza. He testified that they made their exchange there, and then they decided that they had enough spare time to "hook up" for sex. He testified that they parked on the side of the road next to the bridge, and he saw the victim put his phone on the charger in the car. He testified that they walked down to "the spot" by the water. He testified that a few minutes later, the victim went back up the hill because he thought he heard a noise and wanted to check on his car.

The defendant testified that over time he had started to develop feelings for the victim. The defendant testified that when the victim returned back to "the spot," he told the victim that he was starting to care for him. He testified that the victim's reaction was "not good." He testified that the victim started to undo his zipper and stated: "This is all I want from you." The defendant testified that he "lost it." He testified that his rage took over, and he tackled the victim on his back. He testified that he grabbed a rock and hit the victim in the head repeatedly while the victim struggled. He testified that the two of them ended up in the water, and when the victim quit struggling, he assumed the victim was dead.

The defendant testified that he "freaked out" and ran back to the cars. He testified that he retrieved some latex gloves from his own car and rifled through the victim's car, looking

for money or pills. He testified that he found some money under the seat, which he spent on more pills. He testified that sometime later, he spoke with Mr. Marney and attempted to get him to provide him with a false alibi. He testified that he also lied during his statement to police, because he was scared and embarrassed. He testified that he still had feelings for the victim.

On cross-examination, the defendant testified that he weighed 250 pounds. He acknowledged that the victim was very thin and had no real muscle mass. He testified that he had been to the victim's house perhaps five or six times. He testified that he did not know what the victim's parents did for a living and did not know how many siblings the victim had. The defendant testified that he lived with his parents, and he knew that his parents' house was empty on the night of the victim's death because his father was at work.

The defendant testified that his first sexual encounter with the victim was in the parking lot at Bullfeathers. He testified that he and the victim took turns performing oral sex on each other. He estimated that in the weeks prior to the victim's death, he had sexual relations with the victim two or three times a week. He testified that their sexual encounters usually involved him performing oral sex on the victim.

Following the defendant's testimony, the defense rested. The parties gave closing arguments, and the case was submitted to the jury. The trial transcripts reveal that the jury later returned with a verdict finding the defendant guilty as charged.[2] The trial court polled the jury by show of hands, asking if the verdict read in open court was their verdict, and then the court stated: "I count 12 right hands." In response to the court's inquiry concerning whether either side wanted further polling, the following exchange occurred outside the presence of the jury:

> [Defense Counsel]: I don't know how to do this. I mean, they sent one in, it was second and a few minutes later said first.
>
> The Court: Well the—it was sent back telling them that that's an illegal verdict. I can't accept the verdict—I can't accept the verdict of second degree unless they acquit as to felony murder which is the law. That is in the instructions—they cannot consider the second count until—unless they acquit as to the first.
>
> [The prosecutor]: He can ask for an individual polling if that's their verdict.

---

[2] Any activity that occurred after the jury left for deliberations is not reflected in the trial transcripts for that day.

The Court: That was explained to them twice. I can't—well, I can do that. I can ask individually is the—are the felony murder verdicts your verdict. If you want me to do that, I can. I can't go into what the counts were, what the—you know.

[Defense counsel]: No. I'm not saying that. I just—

The Court: We'll poll them individually if you wish.

[Defense counsel]: It's bizarre.

The Court: Well, there was some—they had some disagreement. I think they probably—some of them probably—some—well, implicitly, I think some felt more comfortable with second-degree murder but when they found out they could not find him guilty of second-degree without acquitting him of felony murder, they were unwilling to do that because they actually thought he did commit felony murder.

Now, I will poll them individually and make them say that they believe he committed felony murder if you want me to.

[Defense counsel]: Yes.

The trial court proceeded to poll the individual jurors with respect to their verdict of guilty to felony murder in counts I, II, and III of the indictment. Each of the jurors agreed that guilty was their verdict with respect to those counts. After polling the individual jurors, the trial court dismissed the jury and accepted their verdict in its capacity as thirteen juror. The court imposed a sentence of life in prison with the possibility of parole and scheduled a sentencing hearing on the remaining counts.

At a sentencing hearing held on May 17, 2012, the trial court sentenced the defendant as a Range I, standard offender to eighteen years for especially aggravated robbery, a Class A felony, and one year for burglary of an automobile, a Class E felony. Because the defendant had already received a life sentence for felony murder, the trial court found that it could not order the defendant to serve his sentences consecutively as a dangerous offender because it could not make the requisite finding that consecutive sentencing was necessary to protect society from any danger that might be posed by the defendant in the future. Consequently, the trial court ordered the defendant to serve all of his sentences concurrently.

In his motion for new trial, which was argued at the same hearing, the defendant argued that the evidence was insufficient to support his convictions and raised numerous other claims. The defendant specifically argued that the trial court had improperly influenced the jury's final verdict and erred by failing to bring in the jury's first verdict—which the defense asserted found the defendant guilty of second degree murder—and read it in open court. Defense counsel asserted that the trial court should have sent back a note explaining the difficulty with the first verdict and requesting a correction. Defense counsel pointed out that the jurors may not have understood the nature of the error they had made in the first verdict. Defense counsel argued that on the unique facts of this case—where, according to the defendant, the jury spent nine and a half hours deliberating before finding the defendant guilty of second degree murder and then spent only a few minutes deliberating before finding the defendant guilty of first degree murder following an *ex parte* communication with the judge—it appeared likely that the jury had misinterpreted whatever communication had come from the judge. The State responded that whatever error may have occurred was cured when the judge polled the jury.

In denying the defendant's motion for a new trial, the trial court further clarified its recollection concerning the events that had occurred off the record during jury deliberations:

> With regard to the problem with the problem with the verdict form, I didn't try to explain the sequence of time when I was explaining to you all what had happened. The jury sent back a question at one point and I quoted it in—when we were receiving the verdict. The question was, "[i]f not unanimous on felony murder do we move on to second-degree murder or hung jury?" And the response I gave them was to underline the portion of the instructions dealing with how they deliberate. And that they—before they can move to any lesser included offense they must acquit as to the greater offense. And that is Tennessee's law at the present time.
>
> I had some discussions actually with a Supreme Court Justice in our last conference, this case made the rounds pretty quick, people heard that a jury had come back and come back with a—you know, circled second degree murder without making a determination of the greater offense, and the judge sent it back, and then they came back with first degree murder, felony murder. That was—it got a lot of people's attention. And there's some thought being given to whether or not our law regarding that is constitutionally mandated as part of due process. Some thought is being given to the proposition that perhaps we should let a jury come back with a verdict saying that they've done their best and they've taken all reasonable efforts to reach a verdict on the greater offense and they cannot, but that they do agree on one of the lessers, and accept that as

-12-

a valid verdict. That may—I don't know if that will ever develop, but there was some discussion of that.

However, it's not the law now. I mean our law now a jury cannot find a person guilty of a lesser offense unless they acquit as to the greater. That's our law. Whether it should be or not I don't know—that's another topic, but right now it is our law.

And so the verdict form—or the form that they finally circled and the jury foreman signed was not a valid legal verdict. Now the Court — when the Court told them first of all, by underlining the instructions, told them, no, you can't do it that way, you must acquit as to the greater offense, and then when they presented me with the verdict form where they had circled second degree, and had not acquitted on the charged offense, and I sent it back to them. I was not refusing a valid legal verdict. At least in this Court's opinion I was not. That was not a valid legal verdict. Had it been, I would've immediately brought into court.

In retrospect I wish I had brought that form into the court and let you all see it and be aware of what was going on as I made the decision to do what I did. But I think I did what I had to do, and I don't believe it is outside influence. I believe as the general stated, it's not outside influence for the Court to instruct the jury as to how to deliberate and how to render a verdict. That's what the Court has to do and is supposed to do. So I don't believe there was any kind of outside influence involved.

The court went on to state that at least a full half an hour had passed from the time the court sent back the original verdict to the time the jury returned with the second verdict, and consequently, "[i]t wasn't just an immediate knee-jerk reaction." The trial court further explained that the court believed that "a plausible explanation" for the events that had transpired was that the jury had agreed that the defendant had committed felony murder but "wanted to give him a break." The trial court further speculated that some of the jurors had refused to acquit on first-degree murder, and, as a result, "they came to that impasse." The trial court stated that eventually, the jury came in, gave everyone the second verdict, and he had polled each of them individually concerning the results. The trial court concluded by stating: "I'm interested to see what the appellate courts do with this."

The defendant filed a timely notice of appeal challenging the sufficiency of the evidence and raising two other claims concerning the jury's verdict. We proceed to consider his claims.

**ANALYSIS**

The defendant argues that the evidence is insufficient to support his convictions for first degree (felony) murder and especially aggravated robbery. In addition, he claims that the trial court erred by charging the jury to reach a unanimous verdict with respect to his first degree murder charges before proceeding to consider a second degree murder charge. Finally, the defendant claims that the trial court erred by refusing to accept the jury's initial verdict finding the defendant guilty of second degree murder on the grounds that the jury reached that verdict without indicating on the form any decision with respect to the charge of first degree murder. By rejecting this verdict in *ex parte* fashion, the defendant claims that the trial court acted as an improper outside influence on the jury and likely caused it to change its verdict.

After carefully reviewing the record and the arguments of the parties, we conclude that the evidence is sufficient to support the defendant's convictions. We also conclude that the trial court did not err in charging the jury with respect to the order and manner in which the jury was to consider the charged offense and any lesser-included offenses.

However, the *ex parte* manner in which the trial court considered and rejected the jury's original verdict finding the defendant guilty of second-degree murder, when combined with a lack of clear instructions concerning the cause of that rejection, is sufficient to undermine the public's confidence in the defendant's first degree murder conviction and require reversal. In this case, the trial court failed to bring the allegedly-flawed, original verdict into open court, go on the record, apprise the parties of the situation, and discuss the steps necessary to cure the alleged defect in the verdict. In the unfortunate event that it should occur, a jury's act of submitting an invalid or illegal verdict is a major legal concern. As the trial court belatedly realized, it is not the type of problem that a judge ought to attempt to correct on his or her own, off-the-record and without notification to the parties.

The trial court's actions in this case deprived this Court, the State, and defense counsel of the record necessary to render a fully informed decision concerning whether any improper influence may have been exerted on the jury's deliberations. However, for purposes of resolving this appeal, we will accept the trial court's account of the nature and content of its *ex parte* contact in all areas in which the record is lacking. As best we can determine from reviewing the record as a whole, the defendant's jury deliberated for many hours, issued a verdict indicating that the defendant was guilty of second degree murder, and then switched that verdict to a verdict indicating that the defendant was guilty of first degree murder within minutes of having *ex parte* contact with the trial judge—in which, by our reading of his own account, he informed them that their verdict of second degree murder was illegal without explaining to them why it was so or providing any meaningful guidance as to how the jury

-14-

should go about rectifying their error. On this understanding, we certainly cannot exclude the possibility that the jury misinterpreted the trial judge's rejection of its original verdict (and any accompanying *ex parte* comments he may have made), and erroneously construed it as an indication that the jurors had simply reached the wrong verdict in light of the facts of the case.

Due to the unusual events that occurred during jury deliberations, the public can have no confidence that the defendant's felony-murder conviction is the product of fair, impartial, and influence-free deliberations. Consequently, on the facts of this particular case, we are compelled to reverse the defendant's conviction for first degree murder and remand the case for a new trial on the three felony-murder counts. We affirm the defendant's remaining convictions and sentences and remand the case for further proceedings consistent with the opinion.

## I.

The defendant argues that the evidence is insufficient to support his convictions. "When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Dorantes*, 331 S.W.3d 370, 379 (2011); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "Because a guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, on appeal a defendant bears the burden of showing why the evidence is insufficient to support the conviction." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012). When reviewing sufficiency, we accord the State the strongest legitimate view of the evidence and all of the reasonable inferences that may be drawn from it. *See id.* The jury, not this court, acts as the finder of fact and is responsible for assessing the credibility of the witnesses, deciding what weight to accord their testimony, and reconciling any conflicts in the proof. *See id.* Consequently, on appeal, we will neither re-weigh the evidence nor draw any inferences from it other than those necessarily drawn by the jury. *See id.*

The defendant in this case was convicted of first degree (felony) murder and especially aggravated robbery. "First degree [felony] murder is . . . [a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect, rape of a child, aggravated rape of a child or aircraft piracy." T.C.A. § 39-13-202(a)(2) (2011). When a defendant is charged with first degree murder based on a felony murder theory, "[n]o culpable mental state is required for conviction . . . except the intent to commit the enumerated offenses or acts . . . ." T.C.A. § 39-13-202(b).

That the defendant in this case killed the victim has never been an issue in dispute. The defendant acknowledged killing the victim during his direct testimony at trial. Consequently, the only issue is whether the defendant did so with the requisite mental state, *viz.*, with the intent to commit the underlying crime. The defendant was charged with committing felony murder based on three separate theories involving different predicate felonies—theft, robbery, and burglary—and was found guilty by a jury under all three theories. The defendant pled guilty to burglarizing the victim's automobile prior to trial. Hence there can be little doubt that a reasonable jury could have found that he had mental state necessary to commit the burglary (to which he had already pled guilty) when he killed the victim.

The jury also found the defendant guilty of committing an especially aggravated robbery against the victim. Especially aggravated robbery is any robbery that is accomplished by use of a deadly weapon where the victim suffers serious bodily injury. *See* T.C.A. § 39-13-403. "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401. "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103(a).

There is sufficient evidence in the record for a reasonable jury to determine that the defendant committed an especially aggravated robbery of the victim beyond a reasonable doubt and—although it was not charged as a separate offense and was used only as a separate theory of felony murder—that the defendant committed felony theft against the victim as well. The defendant acknowledged in his direct testimony that, after beating the victim in the head with a rock until he believed the victim was dead, he donned gloves, entered the victim's vehicle, and removed the victim's cell phone and car keys as well as a considerable sum of money. A reasonable jury could have convicted the defendant of the charged crimes based on the admissions contained in his testimony alone, although the jury's conclusion is supported by substantial additional evidence including: video footage documenting the interaction between defendant and the victim in his final moments, a metal box that witnesses testified contained money and that had belonged to the victim that was found in the defendant's residence, the defendant's statement to police and his accompanying decision to escort police officers to the location where the victim's cell phone was recovered, the physical evidence discovered at the crime scene, and the victim's manner of injury and cause of death as detailed in the autopsy report and testimony of the State's medical examiner—all of which we have summarized above.

The defendant's arguments concerning the sufficiency of the convicting evidence with respect to each count boil down to essentially the same argument: that the jury should have

believed his version of the events—that he killed the victim in a scorned lover's rage, with the theft, burglary, and robbery all being mere afterthoughts—rather than the version that was espoused by the State. Any decision between these competing theories hinges on an assessment of the defendant's credibility on the witness stand, along with that of the other trial witnesses. The jury, as the trier of fact, assessed the defendant's credibility on this score and necessarily found it wanting. This court emphatically does not revisit a jury's credibility determinations on appeal. *Wagner*, 382 S.W.3d at 297.

The defendant specifically argues that Ms. Sanchez's testimony that the victim showed her a tin containing $3500 mere days before his death was not credible, that the victim was far too tall for the defendant to have successfully assaulted him with a rock, and that the defendant could not have planned to rob and kill the victim because he did not bring a murder weapon with him to the crime scene. These arguments all pertain to the weight of the evidence, and we do not re-weigh the evidence on appeal. *See id.* The defendant's argument that the evidence is insufficient to support his convictions is denied.

## II.

The defendant argues that the trial court erred by instructing the jury that it must reach a unanimous verdict on the charged offense before proceeding to consider a lesser-included offense. In *State v. Davis*, 266 S.W.3d 896, 904-05 (Tenn. 2008), our supreme court considered this issue and upheld the requirement that a jury must reach a unanimous verdict with respect to the charged offense before proceeding to consider lesser-included offenses. In so holding, our supreme court explained that the right to trial by jury guaranteed by article 1, section 6 of the Tennessee Constitution includes the right to a unanimous jury verdict, and reasoned that consistent with this guarantee a jury could no more acquit a defendant without reaching a unanimous verdict of not-guilty than it could convict a defendant without reaching a unanimous verdict of guilty. *See id.* at 904. Our supreme court also considered the various public policy considerations implicated by the use of "acquittal-first" jury instructions:

> [An acquittal-first instruction] has the merit, from the Government's standpoint, of tending to avoid the danger that the jury will not adequately discharge its duties with respect to the greater offense, and instead will move too quickly to the lesser one. From the defendant's standpoint, it may prevent any conviction at all; a jury unable either to convict or acquit on the greater charge will not be able to reach a lesser charge on which it might have been able to agree. But it entails disadvantages to both sides as well: By insisting on unanimity with respect to acquittal on the greater charge before the jury can move to the lesser, it may prevent the Government from obtaining a conviction on the lesser charge that would otherwise have been forthcoming and thus

-17-

require the expense of a retrial. It also presents dangers to the defendant. If the jury is heavily for conviction on the greater offense, dissenters favoring the lesser may throw in the sponge rather than cause a mistrial that would leave the defendant with no conviction at all, although the jury might have reached sincere and unanimous agreement with respect to the lesser charge.

An instruction permitting the jury to move on to the lesser offense if after all reasonable efforts it is unable to reach a verdict on the greater likewise has advantages and disadvantages to both sides—the mirror images of those associated with the [acquittal-first] charge . . . . It facilitates the Government's chances of getting a conviction for something, although at the risk of not getting the one that it prefers. And it relieves the defendant of being convicted on the greater charge just because the jury wishes to avoid a mistrial, but at the risk of a conviction on the lesser charge which might not have occurred if the jury, by being unable to agree to acquit on the greater, had never been able to reach the lesser.

*Id.* at 906-907 (quoting *United States v. Tsanas*, 572 F.2d 340, 346 (2d Cir. N.Y. 1978) (footnote omitted)). After considering and weighing the competing public policy considerations, our supreme court decided that Tennessee should continue to use acquittal-first jury instructions on the grounds of tradition and because they encouraged more thoughtful jury deliberations, provided better guidance to juries concerning how to proceed with deliberations, reduced the likelihood of compromise verdicts, and increased the overall reliability of verdicts. *Id.* at 907-08. In short, this issue has already been decided.

We acknowledge that Tennessee's continued use of acquittal-first jury instructions is not without controversy. Many states utilize a "reasonable efforts" instruction, which permits jurors to consider lesser-included offenses if they cannot reach a verdict with respect to the greater offense, *see id.* at 906—and there are other, less commonly-used variants as well. No doubt, the many jurisdictions employing alternative approaches have their reasons. The defendant urges that the facts of this case highlight the problems with acquittal-first instructions, arguing that the evidence against him was far from overwhelming and the manner in which the jury reached its verdict—allegedly deliberating for over nine hours before reaching a verdict of second degree murder, only to return minutes later with a verdict of first degree murder after being told by the trial court that its first verdict was invalid—illustrate "the danger and fallacy with the acquittal-first rule." The defendant asserts that although the majority in *Davis* stated that the defendant in that case had not "demonstrated that Tennessee or its criminal defendants are suffering in any way from the acquittal-first instruction," *id.* at 908, his case provides clear proof of a defendant who has indeed so suffered.

-18-

In making these arguments, the defendant may find a sympathetic ear in the form of Justice Gary R. Wade, who, in his concurring opinion in *Davis*, left no doubt that he believed that the majority had erred. As Justice Wade explained: "It is my opinion . . . that the method that best fits within our system, best accounts for the nature of juries, and most likely ensures the economy, consistency, reliability, and thoroughness of the judicial process, is the 'reasonable efforts' approach—the most popular alternative among courts that have addressed the issue and, in my view, the most logical." *Id.* at 911 (Wade, J., concurring). Justice Wade passionately argued that reasonable efforts instructions afford juries the flexibility to avoid gridlock while still permitting them to revisit the greater offense if they deem it necessary. *See id.* Justice Wade claimed that the reasonable efforts approach best reflected the manner in which Tennessee juries actually perform their duties in light of the order and content of their instructions. *See id.* Justice Wade asserted that "juries, knowing of lesser charges, as is required under our state constitution, will unavoidably be influenced by that knowledge" and urged that it would be "preferable, then, to address this reality in a straightforward way that allows the jury, after thoroughly considering a greater charge, to consider the alternatives supported by the evidence." *Id.* at 912. Considering the constitutional implications of such a ruling, Justice Wade stated:

> [T]wo driving principles have remained constant about the process of obtaining a verdict in a criminal trial under our constitution: (1) the judge's role is to instruct the jury on the law; and (2) the jury's role is to decide, within accepted boundaries, which of the relevant laws is applicable, decide the facts, and apply the law to the facts. When an instruction mandates a verdict on the charge in the indictment before consideration of the permissible alternatives, the judge has departed from the role of an instructor of the law. In sum, the acquittal-first scheme is that least likely to respect the function of the jury in its determination of the applicable law and facts.

*Id.* at 916. Justice Wade only agreed with the majority's result in *Davis* because of the overwhelming evidence of defendant's guilt. *Id.*

In light of the spirited debate that occurred in *Davis*, it is unsurprising that the defendant seeks a re-match, one to be fought on what he reasonably believes are more compelling legal facts. But whatever this court's power to advance the state of the criminal law consistent with obligations of judicial hierarchy, comity and *stare decisis*, it surely does not extend to challenging the validity of a directly-controlling supreme court decision only five years old.

If the defendant merely seeks to raise this issue for purposes of preserving the

argument as a basis for a future petition to our supreme court, he has successfully done so. For purposes of resolving his claim in this court, it suffices to state that *Davis* is directly controlling and entirely fatal to the defendant's claim. The defendant's claim that the trial court erred by providing the jury with an acquittal-first instruction is denied.

### III.

Finally, the defendant argues that the trial court improperly influenced the jury to change its verdict. In assessing this claim, we note that the record does not reveal exactly what transpired in the court below. The relevant trial transcript reflects that the jury left for deliberations and then later returned with a verdict finding the defendant guilty of first degree felony murder. The transcript does not even reflect, as it normally would, the time that the jury retired for deliberations and when it returned. After the verdict was announced and in response to a request for polling, the transcripts reflect that an unusual dialogue occurred between the trial judge and defense counsel, which we have quoted *supra*. We are left with nothing more in the way of contemporaneous evidence concerning the matter.

It is clear, however, that the trial court admitted to having some sort of *ex parte* contact with the jury during its deliberations. At the defendant's sentencing hearing, the trial court stated that it had received from the jury a verdict finding the defendant guilty of second degree murder, it had concluded that this initial verdict was invalid because the jury had not indicated that it had reached a verdict with respect to the greater charge of first degree felony murder, and it had sent this initial verdict back to the jury with a message to the effect that the court could not accept the jury's verdict because it was illegal. The trial court also acknowledges, and the record reflects, that the jury later returned with a verdict finding the defendant guilty of first degree felony murder. At a minimum, then, we must conclude that the trial court in this case engaged in an *ex parte*, off-the-record contact with the jury during its deliberations and, for reasons that will now forever remain shrouded in mystery, the jury changed a previously-issued verdict (whether legal or not) following that *ex parte* contact. This is not an acceptable sequence of events in a criminal trial.

Every criminal defendant has a constitutional right to a trial by an impartial jury. U.S. CONST. amend. VI; TENN. CONST. art. I, § 9; *see also State v. Smith,* No. M2010-01384-SC-R11-CD, 2013 Tenn. LEXIS 720, at **9-10 (Tenn. Sept. 10, 2013) ("The right to a trial by jury in both civil and criminal cases is a foundational right protected by both the federal and state constitutions."); *State v. Sexton*, 368 S.W.3d 371, 390 (Tenn. 2012). As an important component of this right, courts have long taken great pains to sanctify the deliberative processes of the jury from outside influences of any sort. *See, e.g., Smith*, 2013 Tenn. LEXIS 720, at *11 ("Tennessee courts have long employed sequestration to protect jurors from outside influences."). "The right to a jury trial envisions that all

-20-

contested factual issues will be decided by jurors who are unbiased and impartial." *Id.* at *10.

As the United States Supreme Court has explained, "the primary if not exclusive purpose of jury privacy and secrecy is to protect the jury's deliberations from improper influence." *United States v. Olano*, 507 U.S. 725, 737-738 (1993); *see also Smith*, 2013 Tenn. LEXIS 720, at *13 ("To assure that juries base their decisions on the evidence properly admitted during the trial, it is necessary to limit the ability of third parties to influence jurors and to limit the ability of jurors to initiate extra-judicial communications with third parties."). "An improper outside influence is any unauthorized 'private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury.'" *State v. Prince Adams*, No. W2009-01492-SC-R11-CD, 2013 Tenn. LEXIS 442, at **11-12 (Tenn. May 16, 2013) (quoting *Remmer v. United States*, 347 U.S. 227, 229 (1954)).

On occasion, "outside" influence on jury deliberations has come in the form of unauthorized *ex parte* contacts between jurors and officers of the judicial branch. In one such situation, involving remarks made by a bailiff that were overheard by deliberating jurors, the United State Supreme Court remarked that "the official character of [a] bailiff—as an officer of the court as well as the State—beyond question carries great weight with a jury which he had been shepherding." *Parker v. Gladden*, 385 U.S. 363, 365 (1966). In another, involving a deputy sheriff acting as a court officer who told a hung jury that they had to reach a decision, our own supreme court stated: "Court officers act as representatives of the court, and they must recognize the official character of their position will cause their comments to carry great weight in the eyes of the jury." *Walsh v. State*, 166 S.W.3d 641, 650 (Tenn. 2005). A proposition that holds true with respect to court bailiffs and deputy sheriffs must necessarily carry even greater force with respect to trial judges.

We are aware of no provision of law—and the State has not directed our attention to any—that authorizes a trial judge to have *ex parte*, off-the-record discussions with jurors concerning substantive matters of law and pertinent matters of procedure while the jury is engaged in its deliberations. Any such private contact necessarily raises eyebrows, and "judges . . . must be — and must be perceived to be — disinterested and impartial." *See, e.g., Smith*, 2013 Tenn. LEXIS 720, at *12. We do not believe that the trial judge in this case harbored any ill intent when he quietly rejected the jury's initial verdict, and we note that the record reflects that he stated at a later date that "[i]n retrospect I wish I had brought that form into the court and let you all see it." We also recognize that while they are off of the bench, trial judges will often be placed in positions where some informal conversation with jurors is inevitable. However, when the inevitable *ex parte* contact between jurors and judges does occur, it should not include any statements concerning the relevant law or the facts of the case at hand. *See Walsh*, 166 S.W.3d at 650 (explaining that court "[o]fficers must carefully guard

-21-

against making any statements of law or prejudicial comments to jurors").

We recognize that once an improper influence on jury deliberations has been shown, reversal may still not be required if the defendant has suffered no prejudice. *Olano*, 507 U.S. at 737-740; *Prince Adams*, No. W2009-01492-SC-R11-CD, 2013 Tenn. LEXIS 442, at **20-21 (Tenn. May 16, 2013) (holding defendant entitled to no relief on claim that a note from a discharged alternate juror to the jury foreman exerted an improper influence on jury verdict because there was no reasonable possibility that the note had affected the verdict). In this regard, the United States Supreme Court has explained that:

> [T]he Constitution "does not require a new trial every time a juror has been placed in a potentially compromising situation . . . [because] it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). There is scarcely a lengthy trial in which one or more jurors do not have occasion to speak to the trial judge about something, whether it relates to a matter of personal comfort or to some aspect of the trial. The lower federal courts' conclusion that an unrecorded ex parte communication between trial judge and juror can never be harmless error ignores these day-to-day realities of courtroom life and undermines society's interest in the administration of criminal justice.

*Rushen v. Spain*, 464 U.S. 114, 118-119 (1983). In our state, proof of an improper influence creates a presumption of prejudice, one that may be rebutted in light of "(1) the nature and content of the information or influence, including whether the content was cumulative of other evidence adduced at trial; (2) the number of jurors exposed to the information or influence; (3) the manner and timing of the exposure to the juror(s); and (4) the weight of the evidence adduced at trial." *Adams*, 2013 Tenn. LEXIS 442, at *21. The ultimate question that must be answered by a reviewing court is this: "Did the intrusion affect the jury's deliberations and thereby its verdict." *Olano*, 507 U.S. at 739; *see also Adams*, 2013 Tenn. LEXIS 442, at *21 ("[C]ourts should consider all of the factors in light of the ultimate inquiry—whether there exists a reasonable possibility that the extraneous prejudicial information or improper outside influence altered the verdict."). Consequently, a strong argument could be made that the proper remedy in this case is to remand the case back to the trial court to conduct a hearing concerning whether the *ex parte* contact between the trial judge and the jury was prejudicial. Our supreme court recently employed precisely such a remedy in a case involving extrajudicial communication between a juror and a witness. *See Smith*, 2013 Tenn. LEXIS 720, at *29.

However, as this case involves only unauthorized contact between the jurors and the

trial judge himself, remanding the case and ordering a hearing on the issue of prejudice would necessitate the appointment of a new trial judge—both in order to avoid any perception of bias and because the present judge, as seemingly the sole non-juror witness to the contact, would almost certainly be called to take the stand. We do not believe that employing this cumbersome approach (with, we anticipate, its resulting spectacle) is appropriate on these facts. On the record before us, it appears extremely likely—and certainly "reasonably possible"—that the trial judge's *ex parte* contact altered the jury's verdict. The facts as related by the trial court speak for themselves. After many hours of deliberation, the jury returned a verdict finding the defendant guilty of second degree murder. The trial court, acting alone and without notification to the parties, sent this verdict back to the jury, telling them only that the verdict they had given him was illegal. Less than an hour later, the jury issued a different verdict, finding the defendant guilty of first degree murder. It thus appears that there is a reasonable probability that the trial court's unauthorized intrusion into the jury's deliberations affected its verdict. On these facts, the public can have no confidence that the defendant's verdict was fairly and properly rendered. Therefore, in order to "promote[] and preserve[] the public's confidence in the fairness of the system," *Smith*, 2013 Tenn. LEXIS 720, at *11, we reverse the defendant's felony-murder convictions and order a new trial on these charges.

The State argues that the decision below should be affirmed because "the trial court's immediate action in having the jury correct the verdict forms was proper." The State urges that a verdict that does not conform to law is void and that if a verdict is to be corrected, a trial court must take action before a jury is discharged. The State directs our attention to numerous cases in support of these propositions. In our view, these arguments do not address the issue at hand, which concerns only the *manner* in which the trial court chose to address any problems that may have existed with the jury's original verdict and not whether the court generally had the authority or the duty to do so in these circumstances.

As we have already confirmed in Section II, *supra*, a trial court does indeed have the authority to take appropriate steps if, after reviewing a verdict, the court should conclude that the jury failed to follow its instructions to reach a unanimous verdict on the charged offense before proceeding to consider a lesser-included offense. But to ensure effective appellate review, any such decision ought to be reached on the record and only after the parties have had notice and an opportunity to be heard on the issue. When rejecting a verdict on the grounds that it is illegal, a trial court should endeavor to explain to the jury the reasons for that rejection—even if such reasoning is limited to simply re-reading the relevant instructions in open court. The trial court may also wish to solicit input from the parties concerning what response ought be given to the jurors, just as many courts do when they receive a question from the jury during its deliberations. But regardless of the precise manner in which the problem is addressed, a jury's rendering of an illegal or invalid verdict is not an issue that

-23-

should be dealt with behind closed doors.

## CONCLUSION

The judgments finding the defendant guilty of first degree (felony) murder are reversed, and it is ordered that the defendant receive a new trial on these counts consistent with this opinion. The judgments and sentences concerning the defendant's convictions for especially aggravated robbery and burglary of an automobile are affirmed. Because the trial court's decision concerning consecutive sentencing on these convictions was expressly premised on the fact that the defendant had already received a life sentence for felony murder, the trial court is authorized to revisit the issue of consecutive sentencing after the defendant's felony murder charges are resolved in the event that the defendant receives less than a life sentence on those charges.[3]

_____
JOHN EVERETT WILLIAMS, JUDGE

---

[3] There is some confusion in the record as to whether the trial court merged Count IV, the especially aggravated robbery, into the defendant's conviction for Count I, felony murder, as it did with Counts II and Count III, the felony murder convictions based on alternative theories. The judgment sheet for Count I indicates merger; the judgment sheet for Count IV does not indicate merger and affirmatively indicates a separate concurrent sentence. In light of this Court's reversal of the defendant's convictions on Counts I-III, the judgment for Count IV should not be considered merged with those counts at this juncture, and should remain in effect as a separate conviction until such future time as the facts may indicate that merger is appropriate.