IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs at Knoxville September 16, 2014

**STATE OF TENNESSEE v. IBRAHIM TALAFHAH**

**Appeal from the Criminal Court for Wilson County**
**No. 12-CR-581    David Earl Durham, Judge**

---

**No. M2013-01556-CCA-R3-CD - Filed October 21, 2014**

---

The Defendant, Ibrahim Talafhah, was convicted after a bench trial in the Wilson County Criminal Court of harassment, a Class A misdemeanor. *See* T.C.A. § 39-17-308(a)(2) (2014). The trial court sentenced the Defendant to serve ten days in jail with the balance of his eleven-month, twenty-nine-day sentence to be served on probation. On appeal, the Defendant contends that the trial court erred by denying him his constitutional right to a jury trial. We conclude that the Defendant was denied his right to a jury trial, and we reverse the judgment of the trial court and remand the case for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed;**
**Case Remanded**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROGER A. PAGE, JJ., joined.

Comer L. Donnell, District Public Defender; E. Marie Farley (on appeal), Assistant Public Defender; and William E. Griffith (at trial), Nashville, Tennessee, for the appellant, Ibrahim Talafhah.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Tom P. Thompson, District Attorney General; and Thomas H. Swink, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to a personal dispute that escalated through a series of telephone calls between the Defendant and the victim, Tarek Aly. At the trial, the victim testified that the Defendant first called him in May 2012 and accused him of being the reason the Defendant's wife had kicked the Defendant out of their home. He responded that he had nothing to do

with the matter and that the Defendant's problem was with his wife. The Defendant replied, "[Y]ou are the one that I should blame and I should take my revenge from and it's going to be like an open war. That includes, but not limited to, yourself, your properties and even . . . your family as well, and your professional career as well." The victim denied the accusation and tried to calm the Defendant. Both the victim and the Defendant spoke Arabic during their conversation.

The victim testified that he had a physical relationship with the Defendant's wife while the Defendant was in Jordan. The Defendant's wife eventually informed the Defendant of this affair.

The victim identified his telephone record from AT&T. He counted at least five calls, three of which originated from an unknown number, that were placed by the Defendant to him on May 23. The first call lasted seventeen minutes, and the victim explained he stayed on the telephone because he did not understand the reason for the call.

The victim testified that he believed he told the Defendant to leave him alone and to stop calling. Nonetheless, the Defendant continued to call and to hang up approximately ten times during May 2012 from an unknown number. The calls came to the victim's cell phone or to his home telephone.

The victim testified that he eventually became alarmed and annoyed by the calls. Further, he became scared when he heard from a friend living with the Defendant that the Defendant planned to use the Defendant's wife to lure the victim to their home. The Defendant had said he would hide in a bush and shoot the victim in the dark, claim the victim was a "perpetrator," and hide from the authorities in Europe.

On cross-examination, the victim testified that the first call on May 23 was at 6:20 p.m. He agreed that during this first call, the Defendant confronted him about the affair. He admitted the Defendant did not threaten him until the second call. During the second call, which took place at 8:52 p.m. and lasted for six minutes, the Defendant said, "I'm going to wage a war over you and it's not limited to yourself, your body, but it's going to include everything that you have. I'm going to destroy you because you are the one who is behind what happened to me." The Defendant cursed the victim, calling him a bad person, and the victim became annoyed. The third call at 9:52 p.m. lasted one minute, and the victim could not recall whether any words were spoken.

The victim testified that he could not identify who called him from the unknown number. He also admitted that despite the conflict with the Defendant, he told the Defendant's wife in an email he wanted the couples to sit down and to peacefully "sort out"

the May 23 calls. He admitted he did not file a police report against the Defendant until May 27. On redirect examination, he agreed that before May 23, he had never experienced any problems with hang-up calls from unknown numbers.

Ayman Abutalab, the Defendant's previous manager at Domino's, testified that the Defendant stayed in Mr. Abutalab's home for about one month after returning from Jordan because the Defendant's wife and her family did not like him in their home. During this time, the Defendant kept Mr. Abutalab informed of the situation with his wife and the victim and kept speaking "bad" about the victim.

Mr. Abutalab testified that the Defendant told him the following: The Defendant planned to make his wife call the victim and tell him to come to the Defendant's home at night while the Defendant hid in his yard. When the victim arrived, the Defendant would shoot him, claiming he did not know him. For the next forty-eight hours, he would "go fly." Mr. Abutalab reported this plan to the victim, urging him to avoid listening to the Defendant's wife and to be careful because the Defendant was serious and was ready to do "something" to him.

Mr. Abutalab testified that while he and the Defendant were at Mr. Abutalab's home in May 2012, he saw the Defendant call the victim. The Defendant spoke about starting a "bad war" against the victim. He admitted to Mr. Abutalab that he continued to call the victim from a different number.

On cross-examination, Mr. Abutalab testified that he only saw the Defendant call the victim once on May 23 around 4:00 or 5:00 p.m. and that the call lasted five or six minutes. He heard the Defendant tell the victim in Arabic that among other things, the Defendant would "kill him and cut him" into little pieces. During this same time frame, the Defendant shared the details of his plan with Mr. Abutalab. Mr. Abutalab believed he notified the victim about the plan on the same or the following day. He testified that before the trial, the Defendant asked him to "close [his] mouth" and to change his testimony in exchange for money, but he refused. He also obtained an order of protection against the Defendant, but it ultimately was dismissed.

The Defendant testified that three calls took place on May 23. The first call was placed by the victim to the Defendant at 6:20 p.m., lasted seventeen minutes, and involved no threats or name-calling. The Defendant and the victim spoke about "regular" things, including how to make the Defendant's bachelor's degree from Jordan equivalent to a degree from the United States. The second call was placed by the Defendant to the victim, lasted two or three minutes, and involved no threats. The third call was placed by the victim to the Defendant,

lasted two minutes, and involved no threats. At this time, the Defendant did not know about the affair.

The Defendant testified that he did not learn about the affair until two or three days after May 23 when the victim called the Defendant's wife and the Defendant asked her the reason for the victim's call. When the Defendant's wife responded that the victim needed help finding a divorce attorney, the Defendant asked her why she would help him. He then called the victim to ask "what's going on," and the victim sounded nervous. After this conversation, the victim's wife called the Defendant from the victim's telephone to inform him that she had evidence the victim and the Defendant's wife had "been together." After the call ended, the Defendant sent a text message to the victim's wife with his email address in order for her to send him the evidence of the affair.

The Defendant identified a record displaying a list of calls made to and from his telephone on May 23. He identified the first call at 6:20 p.m. as incoming from the victim, the second call at 8:52 p.m. as outgoing to the victim, and the third call at 9:52 p.m. as incoming from the victim.

On cross-examination, the Defendant testified that he was not upset about the affair because his wife had already told him about an affair with a person named Juliano. He was also not upset when the victim's wife told him that she had evidence of his wife and the victim being together because he thought she was referring to the two as "hanging out." He denied calling or threatening the victim after learning about the affair. He said he stayed with Mr. Abutalab for four or five days between the end of March 2012 and the beginning of April 2012 because his wife had informed him by email before he returned to the United States that their home was full of guests.

Upon this evidence, the trial court convicted the Defendant of harassment. This appeal followed.

The Defendant contends that the trial court erred by denying him his constitutional right to a jury trial. The State concedes reversible error because the Defendant did not knowingly waive his right. We conclude that the Defendant was denied his right to a jury trial, and we reverse the judgment of the trial court and remand the case for a new trial.

"The right to a jury trial in both civil and criminal cases is a foundational right protected by both the federal and state constitutions." *State v. Smith*, 418 S.W.3d 38, 44 (Tenn. 2013). Article I, section 9 of the Tennessee Constitution states, in pertinent part, "[t]hat in all criminal prosecutions, the accused ha[s] the right . . . in prosecutions by

-4-

indictment or presentment, [to] a speedy public trial, by an impartial jury of the County in which the crime shall have been committed [.]"

While the right to a jury trial in a criminal case is inviolate, the right may, nonetheless, be waived. *State v. Ellis*, 953 S.W.2d 216, 220 (Tenn. Crim. App. 1997)*.* At common law*,* a defendant had no right to waive a jury trial. However, our supreme court has held that nothing in either the state or federal constitutions prohibits the legislature from conferring such a right under appropriate safeguards. *See State v. Durso*, 645 S.W.2d 753, 758 (Tenn. 1983) (citing *Seale v. Luttrell*, 428 S.W.2d 312 (Tenn. 1968)). Accordingly, Tennessee Rule of Criminal Procedure 23 provides that a defendant may "waive a jury trial at any time before the jury is sworn" as long as the waiver is (1) in writing, (2) consented to by the district attorney general, and (3) approved by the court. Tenn. R. Crim. P. 23(b).

Notwithstanding Rule 23, waiver may also be found when the record "clearly show[s] a voluntary relinquishment of the rights to be tried by a common law jury," even in the absence of a written waiver. *State v. Bobo*, 814 S.W.2d 353, 359 (Tenn. 1991). To show voluntary relinquishment, a defendant must "be advised by the court of his or her right to a jury trial" and must "*personally* waive the right in open court for the record." *Ellis*, 953 S.W.2d at 221-22 (emphasis in the original). Thus, waiver cannot be found in a "silent record," and counsel may not waive the right for a client. *Id*. at 221. Instead, waiver must be a "matter of certainty," and a denial of the right should not be regarded as harmless error. *Id*. at 221-22.

The record reflects that on March 4, 2013, a trial scheduling hearing took place. At the hearing, the Defendant and the prosecutor were present, but defense counsel was absent due to an illness. The following discussion ensued:

| | |
|---|---|
| THE COURT: | Let's get it tried. Do you think he'd want to do this jury or nonjury, General? |
| GENERAL SWINK: | Judge, we have talked about the possibility of a bench trial. I don't know if the Defendant will – |
| MR. TALAFHAH: | Sir, I want complete justice. I mean, what's better. I will not accept injustice. |
| THE COURT: | Let's do May 14th for trial. |

GENERAL SWINK:                          Judge, I'll let Mr. Griffith know, and if there's an issue then we'll just get back with you.

THE COURT:                              Thank you.

The record reflects that this was the only hearing in which the trial court and the parties discussed whether a jury or a bench trial should be held. Following this hearing, the Defendant was tried on May 14 by the judge and was convicted of harassment. We note the Defendant filed a pro se notice of appeal in which he stated as the basis for his appeal the denial of a "trial with grand jury" and the lack of credible witness testimony.

The record does not contain a written waiver of a jury trial signed by the Defendant or an oral waiver made by him in open court on the record. Although the trial judge asked the prosecutor at the scheduling hearing whether the defense would like to "do this jury or nonjury," the Defendant never acknowledged he was waiving a jury trial. Further, the record does not reflect that the Defendant understood his right to a jury trial or that the trial court ever advised him of that right. *See Ellis*, 953 S.W.2d at 221. Thus, we conclude that the Defendant was denied his right to a jury trial.

Based on the foregoing and the record as a whole, we reverse the judgment of the trial court and remand the case for a new trial.

_____
ROBERT H. MONTGOMERY, JR., JUDGE